[Cite as *State v. Whipple*, 2012-Ohio-2938.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-110184 |
| | | TRIAL NO. B-0903962-A |
| Plaintiff-Appellee | : | |
| | | |
| vs. | : | *O P I N I O N.* |
| | | |
| FONTA WHIPPLE, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  June 29, 2012

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Sarah M. Schredargus*, for Defendant-Appellant.

Please note:  This case has been removed from the accelerated calendar.

**DINKELACKER, Judge.**

{¶1} Following a jury trial, defendant-appellant Fonta Whipple and co-defendants Jashawn Clark and Eric Long were convicted of several offenses stemming from two shootings in March 2009. The first shooting took place at the home of Mark Keeling and Keyonni Stinson on Matthews Drive in Lincoln Heights, Ohio. For this incident, Whipple was convicted of one count of having weapons while under disability, one count of improperly discharging a firearm, and three counts of felonious assault. The second shooting occurred on Interstate 75 between the Sharon Road and Glendale Milford Road exits. For this incident, Whipple was convicted of one count of having weapons while under disability and two counts of aggravated murder.

{¶2} Whipple now appeals, raising nine assignments of error.[1]

### The Matthews Drive Shooting

{¶3} The evidence adduced at trial reflects that in the early hours of March 4, 2009, Keeling and Stinson were celebrating a birthday with their friend Kyrie Maxberry at the Garage Bar in Sharonville, Ohio. They left the bar sometime after 2:00 a.m. for Keeling's and Stinson's home on Matthews Drive in nearby Lincoln Heights. As they approached Matthews Drive, they noticed Whipple driving a gray van. Clark was in the front passenger seat of the van, and Long was in the backseat. Keeling testified that he had felt concerned when he saw Whipple, Clark, and Long because of something that had occurred when he and the three men were at a local nightclub a few days earlier. Keeling did not elaborate on that incident.

{¶4} When Keeling, Stinson, and Maxberry reached Keeling's and Stinson's home, it appeared that Whipple had followed them. Moments after they hurried inside, bullets burst through the front walls of the home. Keeling was shot in the back and

---

[1] Clark and Long have appealed under the case numbers C-110137 and C-110160, respectively.

neck, Maxberry was shot in the face, and Stinson was nearly shot while ducking for cover. At the scene, police later recovered over two dozen casings shot from three high-caliber weapons.

{¶5}    After a few days passed, Stinson returned to Matthews Drive to clean her home and to gather her belongings. While she was there, she saw Whipple slowly driving down Matthews Drive in the same gray van with Clark and Long.

### The Interstate 75 Shooting

{¶6}    Two weeks later, on March 17, 2009, Alisha Kloth rented a silver Dodge Caliber for Whipple—the father of her young child—at his request.

{¶7}    Later that night, a fight broke out at the Garage Bar. Security guards intervened and herded several individuals outside the bar, including Scott Neblett. Across the street, in a Cracker Barrel restaurant parking lot, Neblett exchanged heated words with Long's cousin Trenton Evans. The altercation ended when Evans brandished a firearm. Evans then left the parking lot and walked to an adjacent Thortons gas station.

{¶8}    Meanwhile, standing outside the bar, Derreyl Anderson saw Whipple, Clark, and Long with Jackie Thomas in a silver Dodge Caliber rolling through the entrance to the Cracker Barrel parking lot. Anderson also saw Neblett and another man walking toward a red TrailBlazer.

{¶9}    When Evans arrived at Thortons, he saw Whipple, Clark, and Long with Thomas sitting in a silver Dodge Caliber. As he approached the four men, he heard them talking about his altercation with Neblett, who soon walked inside the gas station.

{¶10}    Shortly thereafter, Anderson noticed the Caliber that he had seen Whipple driving earlier following the TrailBlazer that he had observed Neblett approach. Around the same time, William Gray was driving to work on southbound

3

Interstate 75 when he saw a silver Dodge Caliber and a red Chevrolet Blazer racing up the on-ramp from Sharon Road. Both vehicles cut in front of his pickup truck. The Caliber darted back into the right lane, and the Blazer remained in the left lane. Gray then saw muzzle flashes on the driver's side of the Caliber and heard multiple gunshots. The Caliber sped off the highway at the Glendale Milford Road exit while the Blazer spun out of control, hit a guardrail, and rolled over several times. Police later found Neblett and Keith Cobb dead in the Blazer, along with several casings shot from three high-caliber weapons.

{¶11}   Later that morning, police discovered the Caliber that Kloth had rented for Whipple abandoned in Lincoln Heights riddled with bullet holes. The Caliber also contained hospital discharge papers indicating that Whipple had sustained a gunshot wound to his hand.

{¶12}   A ballistics expert testified that he had analyzed the casings found at both crime scenes, and had concluded that two of the weapons used in the Interstate 75 shooting were also used in the Matthews Drive shooting. The expert could not rule out that the third weapon used in each shooting was the same one.

**Joinder**

{¶13}   In his first assignment of error, Whipple argues that the trial court erred in granting the state's motion to join the counts concerning both shootings for one trial. No such motion, however, appears in the record. Instead, the state charged Whipple in connection with each shooting under one indictment. Nevertheless, Whipple moved to sever the counts with respect to each shooting. We shall, therefore, consider whether the trial court erred in denying this motion.

{¶14}   The state may charge two or more offenses in the same indictment where they "are of the same or similar character, or are based on the same act or

4

transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim.R. 8(A). "Joinder is the rule rather than the exception, and it is favored by the law." *State v. Howard*, 1st Dist. No. C-100240, 2011-Ohio-2862, ¶ 15, citing *State v. Franklin*, 62 Ohio St.3d 118, 122, 80 N.E.2d 1 (1991). But where "it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment * * * the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires." Crim.R. 14. "The defendant, however, bears the burden of proving prejudice and of proving that the trial court abused its discretion in denying severance." *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), syllabus. The state may rebut a defendant's claim of prejudice by showing either that (1) the evidence of the joined offenses would be admissible in separate trials as "other acts" under Evid.R. 404(B), or (2) the "evidence of each crime joined at trial is simple and direct." *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990).

{¶15} Whipple maintains that by not severing the counts regarding the Matthews Drive shooting from the counts regarding the Interstate 75 shooting, the state impermissibly attempted "to show his character as a thug with a gun and prove he acted in conformity therewith." Appellant's Brief at 5.

{¶16} The Ohio Supreme Court, however, has held that joinder of counts concerning a murder and an assault was proper where the crimes were committed three days apart in the same city with the same weapon. *State v. Williams*, 73 Ohio St.3d 153, 158, 652 N.E.2d 721 (1995). The court concluded that evidence tending to show that the same gun was used in both crimes was pertinent to the issue of identity under Evid.R. 404(B). *Id. Accord State v. Martin*, 151 Ohio App.3d 605, 2003-Ohio-

5

735, 784 N.E.2d 1237, ¶ 44 (3d Dist.) (holding that joinder of aggravated-menacing and aggravated-murder counts was proper where the offenses were committed five months apart and witnesses connected the defendant to either purchasing or possessing the weapon used in each incident).

{¶17}   In this case, both shootings were of the same or similar character and were part of a course of criminal conduct.  They occurred within two weeks of each other and within a few miles of the Garage Bar.  In addition, witnesses placed Whipple in the immediate vicinity of the victims shortly before each shooting.  Thus, evidence tending to show that they were committed with the same weapons helped to identify Whipple as the perpetrator of both crimes.  Moreover, the evidence presented with respect to each shooting was simple and direct "such that the jury was capable of segregating the proof on each charge." *Id.* at ¶ 45, citing *State v. Roberts*, 62 Ohio St.2d 170, 175, 405 N.E.2d 247 (1980).

{¶18}   We, therefore, hold that the Whipple was not prejudiced by the joinder of these counts in the indictment, and that the trial court did not abuse its discretion in denying his motion to sever.  The first assignment of error is overruled.

### Weight and Sufficiency of the Evidence

{¶19}   In his second and third assignments of error, Whipple argues that his convictions were not supported by sufficient evidence and were contrary to the manifest weight of the evidence, respectively.  We are not persuaded.

{¶20}   To reverse a conviction for insufficient evidence, we must determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.  By contrast, when reviewing the weight of the evidence, we act as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387,

678 N.E.2d 541 (1997). We review the entire record, weigh the evidence, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice in finding the defendant guilty." *Id.*

{¶21} To support these assignments of error, Whipple contends that no witness actually saw him commit either shooting. This argument is unavailing, however, given the overwhelming circumstantial evidence implicating Whipple in both incidents. *See, e.g., Jenks* at paragraph one of the syllabus ("Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof.").

{¶22} Keeling, Stinson, and Maxberry testified that they had seen Whipple, Clark, and Long following them in a gray van immediately before the Matthews Drive shooting. Keeling indicated that he had felt concerned when he saw the three men due to an incident that had occurred a few days earlier at a local nightclub. Moments after Keeling and Stinson hurried inside their home with Maxberry, bullets burst through the front walls. Keeling was shot in the back and neck, Maxberry was shot in the face, and Stinson was nearly shot while ducking for cover. According to a ballistics expert, casings found at the scene were shot from three high-caliber weapons.

{¶23} In addition, Kloth admitted that she had rented Whipple a silver Dodge Caliber the afternoon before the Interstate 75 shooting. Witnesses placed Whipple, Clark, and Long with Thomas in a silver Dodge Caliber in the early hours of the next day in the immediate vicinity of Neblett. Anderson testified that he had noticed the Caliber following a red TrailBlazer that he had earlier seen Neblett approach. Shortly thereafter, Gray saw occupants of a silver Dodge Caliber shoot the occupants of a red Chevrolet Blazer nearby on Interstate 75. Police found Neblett and Cobb dead inside the Blazer along with casings shot from three high-caliber weapons. Later that

morning, police discovered the Caliber that Kloth had rented for Whipple abandoned in Lincoln Heights riddled with bullet holes, The ballistics expert testified that according to his analysis of casings found at each shooting, two of the weapons used in the Interstate 75 shooting were also used in the Matthews Drive shooting. He could not rule out that the third weapon involved in each incident was the same.

{¶24} On this record, we hold that a rational trier of fact could have found the essential elements of each offense proven beyond a reasonable doubt, and that the jury did not clearly lose its way and create a manifest miscarriage of justice in finding Whipple guilty of each offense. The second and third assignments of error are overruled.

### The Examination of Alisha Kloth

{¶25} In his fourth assignment of error, Whipple argues that the trial court erred in allowing the state to impeach Kloth—its own witness—by means of prior inconsistent statements without a sufficient showing of surprise and affirmative damage.

{¶26} We need not decide, however, whether the trial court erred in this respect. After thoroughly reviewing the record, we hold that any such error would have been harmless. The court instructed the jury to consider the statements at issue only to evaluate the credibility of Kloth and not as substantive evidence. In addition, given the overwhelming and compelling evidence implicating Whipple in the Interstate 75 shooting, we cannot say that any error which may have occurred was prejudicial. The fourth assignment of error is, therefore, overruled.

### Alleged Police Misconduct

{¶27} In his fifth assignment of error, Whipple argues that the trial court erred in excluding evidence of alleged police misconduct. The trial court specifically

prevented him from questioning Sergeant LaRoy Smith of the Lincoln Heights Police Department about Sandra Stevenson, a former Lincoln Heights sergeant, who had investigated Whipple before leaving the department.

{¶28}  Whipple relies exclusively on *Bullcoming v. New Mexico*, 564 U.S. __, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011).  In that case, the defendant was arrested for driving while intoxicated.  At trial, the state introduced a laboratory report certifying that the defendant's blood-alcohol concentration was above the threshold to support the offense.  The analyst who signed the certification was later placed on unpaid leave, and was not called as a witness.  Instead, the state called another analyst who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on the defendant's blood sample.  *Id.* at 2709-2710.

{¶29}  The United States Supreme Court held that the admission of the laboratory report had deprived the defendant of his right to confront a witness against him under the Sixth Amendment to the United States Constitution.  *Id.* at 2713.  *See Melendez-Diaz v. Washington*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) (holding that a forensic laboratory report stating that a suspect substance was cocaine ranked as testimonial for purposes of the Confrontation Clause); *Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.").  The court observed that had the certifying analyst been called to testify, the defendant "could have asked questions designed to reveal whether incompetence, evasiveness, or dishonesty accounted for [the analyst's] removal from his workstation." *Bullcoming* at 2715.

{¶30} Latching onto this remark, Whipple argues that the trial court should have allowed him to examine Smith about why Stevenson had left the Lincoln Heights police department. We disagree. The case at bar does not implicate *Bullcoming* because no testimonial statements by Stevenson were introduced at trial. Thus, she was not a witness Whipple had the right to confront. *Compare Bullcoming* at 2716. Furthermore, even if testimonial statements by Stevenson had been introduced, *Bullcoming* would not have given Whipple the right to cross-examine Smith about those statements. Indeed we know of no authority standing for that proposition. The fifth assignment of error is overruled.

### Authentication

{¶31} In his sixth assignment of error, Whipple argues that the trial court erred in admitting two surveillance videos and screenshots from those videos that purportedly depict the Cracker Barrel parking lot outside the Garage Bar and the Thortons gas station shortly before the Interstate 75 shooting.

{¶32} We need not decide whether the trial court erred in admitting this evidence, however, because again, any such error would have been harmless. The scenes depicted in the videos and screenshots were substantially cumulative to the testimony of several witnesses who saw Whipple sitting in a silver Dodge Caliber at Cracker Barrel and Thortons, as well as later following Neblett's vehicle. Given this testimony and the other evidence presented at trial, the sixth assignment of error is overruled.

### Mistrial

{¶33} In his seventh assignment of error, Whipple argues that the trial court erred in denying his several motions for mistrial. We disagree.

**{¶34}** The decision whether to declare a mistrial lies within the discretion of the trial court. *E.g.*, *State v. Levingston*, 1st Dist. No. C-090235, 2011-Ohio-1665, citing *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 72. Having thoroughly reviewed the record, we cannot say that the trial court acted arbitrarily, unreasonably, or unconscionably in denying these motions. *See Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). We, therefore, conclude that the court did not abuse its discretion in this respect. The seventh assignment of error is overruled.

### Merger

**{¶35}** In his eighth assignment of error, Whipple argues that the trial court erred in convicting him of both improperly discharging a firearm and the three counts of felonious assault in connection with the Matthews Drive shooting. We are not persuaded.

**{¶36}** Under R.C. 2941.25, a trial court may, in a single proceeding, sentence a defendant for two or more offenses "having as their genesis the same criminal conduct or transaction," if the offenses (1) are not allied offenses of similar import, (2) were committed separately, or (3) were committed with a separate animus as to each offense. *See State v. Bickerstaff*, 10 Ohio St.3d 62, 65-66, 461 N.E.2d 892 (1984), quoting *State v. Moss*, 69 Ohio St.2d 515, 519, 433 N.E.2d 181 (1982). "A criminal defendant has the burden of establishing his entitlement to merger of offenses pursuant to the allied-offense statute." *State v. Wesseling*, 1st Dist. No. C-110193, 2011-Ohio-5882, citing *State v. Mughni*, 33 Ohio St.3d 65, 67, 514 N.E.2d 870 (1987). Indeed, there is no presumption that offenses merge, as each case must be individually considered "given that the statute instructs courts to examine a defendant's conduct—an inherently

subjective determination." *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 699, ¶ 52.

{¶37} Whipple fails to show that he is entitled to merger under R.C. 2941.25 because the record demonstrates that he committed each crime at issue with a separate animus. "The Ohio Supreme Court interprets the term 'animus' to mean 'purpose or, more properly, immediate motive,' and infers animus from surrounding circumstances." *State v. Shields*, 1st Dist. No. C-100362, 2011-Ohio-1912, ¶ 16, citing *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979). The court has explained that where "an individual's immediate motive involves the commission of one offense, but in the course of committing that crime he must, *a priori*, commit another, then he may well possess but a single animus, and in that event may be convicted of only one crime." *Logan* at 131.

{¶38} Like all mental states, animus is often difficult to prove directly, but must be inferred from the surrounding circumstances. *Id.* at 131. Thus, the manner in which a defendant engages in a course of conduct may indicate distinct purposes. *See, e.g., State v. Tibbs*, 1st Dist. No. C-100378, 2011-Ohio-6716, ¶ 43-48 (the manner of killing demonstrated a distinct animus to kill the victim separate from the immediate motive to rob him); *State v. Rogers*, 8th Dist. Nos. 97093 and 97094, 2012-Ohio-2496, ¶ 32 (length of time spent in the victim's vehicle indicated a separate animus for the initial break-in and the subsequent theft of items from the vehicle); *State v. Jackson*, 2d Dist. No. 24430, 2012-Ohio-2335, ¶ 140 (where the force used to effectuate an aggravated robbery is far in excess of that required to complete the robbery, there is no merger); *Logan* at syllabus (where the manner in which a kidnapping is conducted demonstrates "a significance independent of the other offense," there exists a separate animus). Courts should consider whether facts

appear in the record that "distinguish the circumstances or draw a line of distinction that enables a trier of fact to reasonably conclude separate and distinct crimes were committed." *State v. Glenn*, 8th Dist. No. 94425, 2012-Ohio-1530, ¶ 9 (citations omitted).

{¶39} This "line of distinction" can be drawn either horizontally or vertically. A court makes this horizontal line of distinction when it considers the amount of time between the commissions of the offenses (i.e. the amount of time during which the conduct occurred is such that a separate animus is demonstrated as to each charged offense). On the other hand, a vertical line of distinction is made when considering the severity of the conduct (i.e. the conduct so exceeds the degree required to commit the one offense that a separate animus is demonstrated as to a second offense). This case falls within the second class.

{¶40} Police recovered 28 shell casings from the crime scene. The casings were found in the street spread across the length of the property, on the sidewalk, in the driveway, in the yard, on the porch, and three were found actually inside the home. Most of the windows of the van the victims had been riding in, which was parked on the street, had also been shot out. The investigating officer testified that "there were casings everywhere. The house had been shot up." Based on where the casings were found, the shooters had been in the street and had advanced through the yard and onto the porch. Keyonni Stinson testified that she had heard footsteps on the porch during the shooting, and that afterward the house had been filled with smoke and dust. The testimony and photographic evidence demonstrated that Whipple and his confederates had gone on a shooting rampage at this Lincoln Heights home, shooting through vehicles, doors, windows, and walls.

{¶41}   In this way, this case is distinguishable from cases like *State v. Walton*, 5th Dist. No. 2011 CA 00214, 2012-Ohio-2597.  In that case, the defendant stood outside the front door and fired five shots into the door, one of which killed the victim.  He was charged with felony murder, with the predicate offense being discharging a firearm into a habitation.  The court found that the two offenses were subject to merger, concluding that the two charges were "inextricably part of the same conduct," but noted that their conclusion "would not necessarily apply to every conceivable scenario of a killing from a drive-by shooting into a house."  *Id.* at ¶ 56.

{¶42}   This case presents such a scenario.  The level of destruction unleashed by Whipple upon the home demonstrates that he sought to do more than commit felonious assault.  Whipple has, therefore, not met the burden of establishing that he is entitled to merger.  Accordingly, the eighth assignment of error is overruled.

### Ineffective Assistance of Counsel

{¶43}   In his ninth assignment of error, Whipple argues that he received ineffective assistance of counsel.  We are not persuaded.

{¶44}   To prevail on a claim of ineffective assistance of counsel, an appellant must show that trial counsel's performance was deficient, and that the outcome of the proceedings would have been different but for counsel's deficient performance.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  "A reviewing court will not second-guess trial strategy and must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance."  *State v. Finley*, 1st Dist. No. C-061052, 2010-Ohio-5203, ¶ 44, citing *State v. Mason*, 82 Ohio St.3d 144, 157-158, 694 N.E.2d 932 (1998).

{¶45}   Whipple argues that his trial counsel's performance was deficient because she did not immediately object to the questioning of Kloth about her prior

inconsistent statement and did not move for a separate trial from Clark and Long. We cannot, however, say that her performance was a deficiency "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland* at 687. The ninth assignment of error is overruled.

{¶46} Accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

**HILDEBRANDT, P.J.,** concurs.

**FISCHER, J.,** concurs in part and dissents in part.

**FISCHER, J.**, concurring in part and dissenting in part.

{¶47} Although I agree with nearly all of the majority's well-reasoned and well-written opinion, I respectfully must dissent with regard to the single matter of whether Whipple was convicted of allied offenses of similar import subject to merger under R.C. 2941.25.

{¶48} As stated by the majority, a trial court may, in a single proceeding, sentence a defendant for two or more offenses "having as their genesis the same criminal conduct or transaction," if the offenses (1) are not allied offenses of similar import, (2) were committed separately, or (3) were committed with a separate animus as to each offense. *See State v. Bickerstaff*, 10 Ohio St.3d 62, 65-66, 461 N.E.2d 892 (1984), quoting *State v. Moss*, 69 Ohio St.2d 515, 519, 433 N.E.2d 181 (1982).

{¶49} The Ohio Supreme Court has held that "when determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." , under *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942, N.E.2d 1061, syllabus, overruling *State v. Rance*, 85 Ohio St.3d 632, 710 N.E.2d 699 (1999). Thus, where "the evidence adduced at trial reveals that the state relied on the same conduct to support the two offenses, and that the

offenses had been committed neither separately nor with a separate animus as to each, then the defendant is afforded the protection of R.C. 2941.25, and the trial court errs in imposing separate sentences for the offenses." *State v. Cooper*, 1st Dist. Nos. C-110027 and 110028, 2012-Ohio-555, ¶ 13.

{¶50} In this case, Whipple was convicted of one count of improperly discharging a firearm in violation of R.C. 2923.161(A) and three counts of felonious assault in violation of R.C. 2903.11(A)(2). Under R.C. 2923.161(A)(1), "No person, without privilege to do so, shall knowingly do any of the following: (1) Discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual." Under R.C. 2903.11(A)(2), "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordinance."

{¶51} The evidence adduced at trial reflects that after Keeling and Stinson hurried inside their Matthews Drive home with Maxberry, Whipple shot multiple rounds into the residence, striking Keeling and Maxberry and narrowly missing Stinson. Because the state relied on the same conduct to prove both the one count of improperly discharging a firearm and the three counts of felonious assault, these offenses were allied offenses of similar import. *See Cooper* at ¶ 15.

{¶52} My analysis, therefore, turns to whether these offenses were committed with a single animus. Where a defendant acts with the same purpose, intent, or motive in the commission of two separate crimes, the animus is identical for each offense. *State v. Lewis*, 12th Dist. No. CA2008-10-045, 2012-Ohio-885, ¶ 13. *See also State v. Shields*, 1st Dist. No. C-100362, 2011-Ohio-1912, ¶ 16, citing *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979).

{¶53}   After thoroughly reviewing the record, I must conclude that Whipple's immediate motive was simply to attack Keeling, Stinson, and Maxberry.   The evidence reflects that he followed the three victims to Keeling's and Stinson's home, and moments after they hurried inside, he opened fire on the residence.   Although the record may demonstrate Whipple's profound depravity, I cannot say that it evinces a distinct animus with respect to these crimes.

{¶54}   Although my opinion would have no bearing on Whipple's ultimate sentence—as each of the convictions at issue carried concurrent eight-year prison terms—I believe that Whipple was convicted of offenses that should have merged. *See State v. Evans*, 1st Dist. No. C-100028, 2011-Ohio-2356, ¶ 5, citing *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 30.   I would, therefore, remand the cause for the limited purpose of resentencing Whipple on either the count for improperly discharging a firearm or the three counts of felonious assault pursuant to the state's election. *See State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, 951 N.E.2d 381, paragraph one of the syllabus.   In all other respects, I would affirm the judgment of the trial court.

{¶55}   Respectfully, I therefore dissent in this limited part.


Please note:
     The court has recorded its own entry this date.