[Cite as *State v. Smith*, 2024-Ohio-2221.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## DEFIANCE COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,

CASE NO. 4-23-05

  v.

DONELL L. SMITH, JR.,

      DEFENDANT-APPELLANT.

O P I N I O N

Appeal from Defiance County Common Pleas Court
Trial Court No. 22-CR-14881

**Judgment Affirmed**

**Date of Decision: June 10, 2024**

APPEARANCES:

    *Henry Schaefer* **for Appellant**

    *Chelsea Cereghin* **for Appellee**

**MILLER, J.**

{¶1} Defendant-appellant, Donell L. Smith, Jr. ("Smith"), appeals the April 11, 2023 judgment of sentence of the Defiance County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This case arises from a September 2, 2022 incident in which law enforcement was dispatched to Mercy Hospital for a report of a patient who had been assaulted. The victim, M.G., alleged that Smith had entered the victim's residence brandishing a firearm, accusing him of taking Smith's girlfriend's purse, and struck M.G. repeatedly with his fist and the firearm.

{¶3} On September 22, 2022, the Defiance County Grand Jury indicted Smith on two Counts: Count One of aggravated robbery in violation of R.C. 2911.01(A)(3), (C), a first-degree felony; and Count Two of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony. Both counts contained a firearm specification pursuant to R.C. 2941.145(A) and a repeat-violent-offender ("RVO") specification under R.C. 2941.149(A). At the arraignment held on September 28, 2022, Smith entered pleas of not guilty.

{¶4} A jury trial was held on March 29-30, 2023. At trial, the State offered the testimony of Patrolman Tristan Sanders ("Patrolman Sanders"), an officer with the Defiance Police Department, who testified that he was dispatched to Mercy Hospital on the morning of September 2, 2022. (Mar. 29-30, 2023 Tr. at 141-142).

-2-

Upon arriving at the hospital, Patrolman Sanders met the victim, M.G., who Patrolman Sanders observed had several injuries to his face. M.G. described an altercation in which Smith and Amber Urbina ("Urbina") arrived at his residence in a gold Nissan and subsequently entered his home. (*Id.* at 143). M.G. described Smith brandishing a firearm and repeatedly striking M.G. (*Id.*). Moreover, M.G. stated that Smith attempted to grab his wristwatch and searched through M.G.'s pockets for other items. (*Id.* at 153, 248-249). M.G. provided a description of Smith and Urbina, as well as a description of Smith's vehicles and residence. (*Id.* at 143-144).

{¶5} Patrolman Sanders took photographs of M.G.'s injuries, which included bruises on his face, a swollen lip, cut on the inside of his lip, a loose tooth, and a laceration near his left eyebrow which subsequently required eight stitches. (*Id.* at 144); (State's Ex. 1). Patrolman Sanders noted that M.G. did not have any defensive wounds on his body, which was consistent with M.G.'s statement that he did not strike back at Smith. (Mar. 29-30, 2023 Tr. at 150-152, 163-164); (State's Ex. 1). Furthermore, Patrolman Sanders testified that the injuries he observed matched M.G.'s description of events. (Mar. 29-30, 2023 Tr. at 155-156).

{¶6} Later that day, Patrolman Sanders recounted that he met up with Det. Kevin Benbow ("Det. Benbow") who believed that he located Smith's residence and vehicles at 117 Main Street. (*Id.* at 145). Patrolman Sanders learned a gold Nissan was registered to Nicole Connerton ("Connerton"), Smith's girlfriend, and a

blue Ford Explorer was registered to Smith and Connerton. (*Id.*). Patrolman Sanders and Det. Benbow were initially unsuccessful in contacting either Smith or Connerton at the residence. (*Id.* at 146). However, later that day, the officers were successful in contacting Connerton and she consented to a search of her and Smith's residence and the gold Nissan. (*Id.* at 146-147). Connerton stated that she does not permit firearms in her residence and that, since Smith was prohibited from possessing firearms due to his criminal history, she would not have allowed him to own one. (*Id.* at 147). Although officers did not find anything notable in their search of the residence, Patrolman Taylor located a nylon pistol holster and two 9-millimeter magazines located underneath the front passenger seat of the gold Nissan. (*Id.*). The magazines had been taped together at the base plates using electrical tape. (*Id.*). No firearms or ammunition were located. (*Id.*). Patrolman Sanders recalled that Connerton appeared to be surprised upon learning of the magazines and holster found in her vehicle. (*Id.* at 162-163).

{¶7} Next, Dr. Eileen Baker ("Dr. Baker"), an emergency physician working at Mercy Hospital on September 2, 2022, testified that she rendered emergency care to M.G. on that day. (*Id.* at 178-180). Dr. Baker stated that M.G. arrived at the hospital at approximately 10:00 a.m. stating that he had been assaulted and complaining of pain in his ribs and wounds to his forehead, face, and lip. (*Id.* at 181). Dr. Baker's physical examination of M.G. revealed an irregularly-shaped laceration approximately two centimeters in length on the left side of his temple

which required eight sutures. (*Id.* at 183-184); (State's Ex. 4). Dr. Baker described this wound as a macerated wound, which indicates that the skin was "smashed open" and torn rather than cut. (Mar. 29-30, 2023 Tr. at 184, 191). According to Dr. Baker, this injury is consistent with M.G.'s statements that he was hit with an object. (*Id.* at 191-192). Dr. Baker also observed some swelling on M.G.'s lower lip; however, the injury did not require sutures. (*Id.* at 183-185, 192); (State's Ex. 4). M.G. presented with a loose tooth which Dr. Baker stated would heal on its own and did not require additional treatment. (Mar. 29-30, 2023 Tr. at 183-185); (State's Ex. 4). M.G. also complained of rib discomfort. (Mar. 29-30, 2023 Tr. at 183-184); (State's Ex. 4). A CT scan on M.G.'s chest revealed new fractures on M.G.'s eighth and tenth ribs. (*Id.* at 186-187); (State's Ex. 4). Dr. Baker described rib fractures as painful injuries that cause four to six weeks of pain and are treated with rest and pain medication. (Mar. 29-30, 2023 Tr. at 186, 188). Dr. Baker described the injuries she observed on M.G. on September 2, 2022 as "fresh," but acknowledged that it is difficult to precisely determine the timeline of rib fractures. (*Id.* at 188).

{¶8} Then, the victim, M.G., testified that he initially met Smith through a mutual friend and, shortly thereafter, they began working together. (*Id.* at 206). On a number of occasions, M.G. and Smith carpooled to work together. (*Id.* at 206, 208). M.G. identified Smith in the courtroom on the record. (*Id.* at 205-206).

{¶9} M.G. stated that on September 2, 2022, he returned home to 1023 Madison Avenue in Defiance, Ohio from work at approximately 6:30 a.m. (*Id.* at

209). At approximately 7:00 or 7:30 a.m. M.G. was sitting on the couch when he observed Smith's gold Nissan pull up. (*Id.* at 209, 215). M.G. observed Smith exit from the passenger side of the vehicle and walk toward the door. (*Id.* at 209). Smith stated that Urbina, with whom M.G. had previously been romantically involved, was in the driver's seat of the gold Nissan and entered the house along with Smith. (*Id.* at 212). When Smith entered the home, he drew a gun from his right pocket and accused M.G. of breaking into Connerton's car and stealing her purse. (*Id.* at 210). M.G. denied that he ever took anything from Connerton, and denied knowing the basis of Smith's allegations. (*Id.* at 213).

{¶10} Upon seeing the gun, M.G. threw his hands in the air and told Smith that he had the wrong person. (Mar. 29-30, 2023 Tr. at 210, 218). In reply, Smith allegedly uttered profanities toward M.G. and slapped him on his face, over his eye, with the gun. (*Id.* at 210). M.G. recalled that the injury caused his face to be covered in blood, making it difficult for him to see. (*Id.*). M.G. stated that he covered his head while Smith "continuously kept striking [him] and striking [him], over and over." (*Id.*). According to M.G., after the second or third strike, Smith ceased using the gun to strike M.G. and instead began hitting M.G. in the head "full force" using his hands. (*Id.* at 210-211).

{¶11} M.G. described the altercation as beginning by the front door and continuing into the kitchen. (*Id.* at 211). M.G. stated that, at the end, M.G. was "balled up" on his knees while Smith "continuously" struck him in the head. (*Id.*).

M.G. recalled Smith pulling at and ripping on M.G.'s pockets while asking, "Where's it at? Where's it at?" (*Id.* at 211, 215). Then, Smith grabbed and pulled at M.G.'s watch "angrily." (*Id.* at 211). Although Smith broke the watch, he did not take it. (*Id.*). According to M.G, after about 15 to 20 minutes, Smith "got frustrated," quit hitting M.G. and walked out of his home without taking anything. (*Id.* at 211, 216). M.G. recalled Urbina telling Smith that they should leave. (*Id.* at 218). He also recalled hearing Urbina nearby during the altercation making statements like "that's enough" and "quit" to Smith. (*Id.* at 251).

{¶12} M.G. described the firearm as a two-toned handgun with two different colors of metal. (*Id.* at 214). M.G. was not able to ascertain what caliber the gun was, but surmised that it may have been a 380. (*Id.* at 215). M.G. stated that he did not know if the gun was loaded. (*Id.*). M.G. testified that when Smith pointed the gun at him, he tried to focus on Smith's eyes. (*Id.* at 215, 245). M.G. recalled observing some "confusion" in Smith's face, which M.G. described as Smith appearing to "try[ ] to make a decision." (*Id.* at 213). M.G. stated that when Smith pulled the gun on him, Urbina said, "[N]o, * * don't do that" which M.G. interpreted as Urbina asking Smith not to shoot M.G. (*Id.*). According to M.G., Smith was shaking and appeared nervous and had an expression which Smith described as one of determination and that "his mind was * * * made up." (*Id.* at 217).

{¶13} M.G. denied any knowledge of the basis of the theft accusations Smith made against him during the encounter. (Mar. 29-30, 2023 Tr. at 217). M.G. denied ever stealing anything belonging to Connerton. (*Id.*).

{¶14} When Smith and Urbina left the house, M.G. closed and locked the door, then assessed his injuries. (*Id.* at 219). M.G. stated that he could not get his head wound to stop bleeding, so he called a cab to take him to the hospital. (*Id.*).

{¶15} M.G. stated that, approximately one week prior the incident, Smith came to M.G.'s house for a haircut and Smith showed M.G. his new gun. (Mar. 29-30, 2023 Tr. at 245-246). Although M.G. did not say anything to Smith at the time, he later asked Smith not to bring the gun back to his house because M.G. does not "believe in" guns. (*Id.* at 246).

{¶16} Scott Hansen ("Hansen"), who was incarcerated in the same housing unit as Smith, testified that Smith informed him that M.G. allegedly stole Smith's girlfriend's purse, which prompted Smith to confront him. (*Id.* at 276, 285). Smith told Hansen that he "pistol whipped [the man] basically, trying to recover what he could." (*Id.* at 276). Hansen testified that he contacted Det. Benbow regarding Smith's admissions because Smith asked Hansen if he knew anyone in Toledo that may be able to make the victim "go away," prompting Hansen to be concerned about M.G.'s safety. (*Id.* at 288-289).

{¶17} Officer Michelle Waltmire ("Officer Waltmire") testified that she transported Smith to CCNO on September 6, 2022, after Smith turned himself in.

(*Id.* at 296-298). Officer Waltmire stated that she observed that Smith had a brace on his right extremity that encompassed his hand, part of his wrist, and forearm. (*Id.* at 297-299). Officer Waltmire recalled that when the nurse at CCNO inquired about the brace, Officer Waltmire heard him respond it "was from the situation that had gotten him there." (*Id.* at 297).

{¶18} Det. Benbow also testified that when Smith turned himself in at the Defiance Police Department on September 6, 2022, Det. Benbow noticed that Smith had a bandage wrapped on his right hand with a brace over the bandage. (*Id.* at 315-316). Det. Benbow took photographs of the bandages and brace on Smith's right wrist, which are depicted in State's Exhibit 12. (*Id.* at 315-316); (State's Ex. 12). Det. Benbow did not speak to Smith or inquire about the reason for the brace. (Mar. 29-30, 2023 Tr. at 317). Det. Benbow testified that, aside from the wrist brace, he did not observe any other injuries to Smith. (*Id.*). Det. Benbow confirmed that law enforcement was never able to recover the firearm used in the incident. (*Id.* at 317, 332-334). Accordingly, Det. Benbow conceded that because they were not able to locate the firearm M.G. described, he does not actually know if the firearm was operable. (*Id.* at 333-334).

{¶19} Subsequent to Smith's arrest, Det. Benbow reviewed the audio recordings of the phone calls Smith made at CCNO. (*Id.* at 318). The audio recordings of three of these phone calls were played for the jury. (*Id.*). In two recorded phone calls on September 7, 2022, Smith and Connerton made several

statements acknowledging that he physically assaulted and injured M.G. (*Id.* at 318-321, 338-339); (State's Ex. 13). Specifically, in one of the calls, Smith stated, "I beat his ass." (Mar. 29-30, 2023 Tr. at 339). In a recorded phone call on February 21, 2023, Smith discussed physically assaulting M.G. to an unknown caller. (*Id.* at 322); (State's Ex. 13). Det. Benbow conceded that although M.G. referenced "beat[ing]" M.G., Smith did not reference a gun. (Mar. 29-30, 2023 Tr. at 339-340).

{¶20} At the conclusion of the trial, the jury found Smith guilty of both counts and the firearm specifications associated with both counts. The trial court accepted the jury's verdict. Thereafter, pursuant to the agreement of the parties, the trial court held a bench trial on the RVO specifications associated with both counts and found Smith guilty thereof.

{¶21} Smith appeared for sentencing on April 5, 2023. At the hearing, Smith's trial counsel argued that the aggravated robbery and felonious assault convictions should merge for sentencing. After considering the State's arguments against merger, the trial court determined that Smith's aggravated robbery and felonious assault convictions were committed with separate animus and were, therefore, not allied offenses of similar import. The trial court sentenced Smith separately on each offense and ordered the specifications to be served consecutively to the underlying sentence. The court then ordered the sentences for the two counts to be served concurrently. The aggregate term of imprisonment for the two counts

and their related specification was 22 to 27.5 years. The judgment entry of sentence was filed on April 11, 2023.

**{¶22}** Smith filed a notice of appeal on April 18, 2023. He raises two assignments of error for our review.

### First Assignment of Error

### The Court Imposed a Sentence Contrary to Law.

**{¶23}** In his first assignment of error, Smith argues that the trial court erred by failing to merge his aggravated robbery and felonious assault charges for purposes of sentencing. He maintains that the two offenses were committed with the same animus.

**Allied-Offenses Review**

**{¶24}** We review de novo whether offenses are allied offenses of similar import. *State v. Tall*, 3d Dist. Union No. 14-22-26, 2023-Ohio-1853, ¶ 7. "De novo review is independent, without deference to the lower court's decision." *State v. Hudson*, 3d Dist. Marion No. 9-12-38, 2013-Ohio-647, ¶ 27.

R.C. 2941.25, Ohio's multiple-count statute, provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain

counts for all such offenses, and the defendant may be convicted of all of them.

The Supreme Court of Ohio has directed the use of a three-part test to determine whether a defendant can be convicted of multiple offenses:

> As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 31.

{¶25} "[T]wo or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at ¶ 23. "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." *Id.* at ¶ 26. "[A] defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *Id.*

{¶26} The term "animus" means "purpose or, more properly, immediate motive." *State v. Logan*, 60 Ohio St.2d 126, 131 (1979), abrogation recognized in *Ruff*. "Like all mental states, animus is often difficult to prove directly, but must be inferred from the surrounding circumstances." *Id.* "Thus, the manner in which a

defendant engages in a course of conduct may indicate distinct purposes." *State v. Whipple*, 1st Dist. Hamilton No. C-110184, 2012-Ohio-2938, ¶ 38. "Courts should consider whether facts appear in the record that 'distinguish the circumstances or draw a line of distinction that enables a trier of fact to reasonably conclude separate and distinct crimes were committed.'" *Id.*, quoting *State v. Glenn*, 8th Dist. Cuyahoga No. 94425, 2012-Ohio-1530, ¶ 9.

**Analysis**

{¶27} At sentencing, the State argued that the aggravated robbery and felonious assault offenses, although committed at the same time, were committed with a separate animus. The trial court agreed with the State's assessment and stated, "[T]he Court does not find that the offenses merged, they're not the product of a single animus, they were clearly separate criminal intents with respect to [Smith's] conduct both in the commission of the Aggravated Robbery and * * * Felonious Assault for causing serious physical harm." (Apr. 5, 2023 Tr. at 7).

{¶28} After reviewing the facts, we do not find that the trial court erred in its determination that the felonious assault and aggravated robbery convictions did not merge for the purpose of sentencing. Here, Smith entered M.G.'s home and pointed a gun at him. Then, he repeatedly struck M.G. in the head with the firearm and his bare hands, beating him until he was on the ground and then continuing to strike him while he huddled in a ball on the ground. Smith intermittently asked M.G. where "it" was (presumably Smith's girlfriend's purse) and grabbed at M.G.'s

pocket and watch, damaging both in the process. Notably, M.G.'s pocket and watch would not have been able to conceal a purse, if that was indeed what Smith was attempting to locate. Furthermore, M.G. testified that he did not attempt to fight back or defend himself during the altercation, a statement that law enforcement officers testified was consistent with the evidence at the scene and the injuries M.G. sustained. Additionally, the physical altercation lasted approximately 15 to 20 minutes. Taken together, the totality of the evidence establishes that the felonious assault and aggravated robbery convictions were committed with separate animus and motivation. *See State v. Guevara*, 10th Dist. Franklin No. 21AP-414, 2023-Ohio-1448, ¶ 23 (["[T]he harm caused by Guevara's commission of the offense of felonious assault was the physical injury to Strucke, while the harm caused by Guevara's commission of the offense of aggravated robbery was the deprivation of Strucke's personal property."). Accordingly, the trial court did not err by determining that Smith's convictions were not allied offenses of similar import.

**{¶29}** Smith's first assignment of error is overruled.

## Second Assignment of Error

**The Convictions Are Against the Manifest Weight of the Evidence, and There is Not Sufficient Evidence to Maintain a Conviction.**

{¶30} In his second assignment of error, Smith argues that his aggravated robbery, felonious assault, and firearm specification[1] convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.

**Standards of Review**

{¶31} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997), *superseded by statute on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, we address each legal concept individually.[2]

{¶32} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of

---

[1] Smith does not challenge the trial court's finding that he is a repeat violent offender.
[2] In his appellate brief, Smith combines his sufficiency-of-the-evidence and manifest-weight arguments. However, after reviewing his arguments in light of the record, we elect to address his claims separately.

fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33.

**{¶33}** On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[w]eigh the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

**Smith's Offenses**

**{¶34}** Smith was convicted of aggravated robbery in violation of R.C. 2911.01(A)(3), which provides:

> (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or

offense shall * * * (3) [i]nflict, or attempt to inflict, serious physical harm on another.

**{¶35}** The statute "expressly predicates every robbery on the elements of a completed or attempted 'theft offense,' including all culpable mental states." *State v. Tolliver*, 140 Ohio St.3d 420, 2014-Ohio-3744, ¶ 8. The applicable theft statute provides:

> No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [w]ithout the consent of the owner or person authorized to give consent[.]

R.C. 2913.02(A)(1). Thus, the culpable mental state for the theft offense "includes the mental states of 'purpose' and 'knowingly.'" *Tolliver* at ¶ 9.

**{¶36}** However, the Supreme Court of Ohio has held that proof of a mental state is not required to demonstrate the infliction or attempted infliction of serious physical harm pursuant to R.C. 2911.01(A)(3). *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, ¶ 53.

**{¶37}** "Serious physical harm to persons" is defined in R.C. 2901.01 to mean any of the following:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
>
> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01.

{¶38} Smith was also convicted of felonious assault in violation of R.C. 2903.11(A)(1), which provides, in relevant part, that "[n]o person shall knowingly * * * cause serious physical harm to another * * *." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Additionally, "[a] person has knowledge of circumstances when the person is aware that such circumstances probably exist." *Id.*

{¶39} The jury also found Smith guilty of the gun specifications associated with both counts. The State was required to prove, beyond a reasonable doubt, that Smith "had a firearm on or about [his] person or under [his] control while committing the offense" of aggravated robbery and felonious assault and "displayed the firearm, brandished the firearm, indicated that [he] possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(A); *see also* R.C. 2929.14(B)(1)(a)(ii); *State v. Smith*, 8th Dist. Cuyahoga No. 111274, 2023-Ohio-603, ¶ 118. The term "firearm" is defined as "any deadly weapon capable of

expelling or propelling one or more projectiles by the action of an explosive or combustible propellant." R.C. 2923.11(B)(1); *see also* R.C. 2941.145(F) ("[a]s used in this section, 'firearm' has the same meaning as in section 2923.11 of the Revised Code"). That term "includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." *Id.* Thus, to support a firearm specification, the State must also "'prove beyond a reasonable doubt that the firearm was operable or could readily have been rendered operable at the time of the offense.'" *State v. Elliott*, 3d Dist. Logan No. 8-21-35, 2022-Ohio-3778, ¶ 51, quoting *State v. Staten*, 10th Dist. Franklin No. 18AP-48, 2018-Ohio-4681, ¶ 11.

{¶40} "When determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm." R.C. 2923.11(B)(2). This includes explicit or implicit threats made by the person in control of the firearm. *Elliott* at ¶ 54; *Thompkins*, 78 Ohio St.3d at 384 ("where an individual brandishes a gun and implicitly but not expressly threatens to discharge the firearm at the time of the offense, the threat can be sufficient to satisfy the state's burden of proving that the firearm was operable or capable of being readily rendered operable"). When a defendant states he has a gun and will use it, "a reasonable trier of fact can infer both the existence and the operability of a gun." *Elliott* at ¶ 61. "The State may establish that a firearm was

operable 'by the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime.'" *Id.* at ¶ 53, quoting *State v. Murphy*, 49 Ohio St.3d 206 (1990), syllabus. Yet, the mere possession of a gun, without something more, is not enough to allow for a finding that it is operable. *Id.* at ¶ 69.

**Analysis**

{¶41} With respect to his aggravated robbery conviction, Smith argues that the State did not offer evidence to support the predicate alleged theft offense. Smith argues that because he was allegedly at M.G.'s residence to retrieve property M.G.'s purportedly stole from Smith's girlfriend, it was legally impossible for Smith to commit a theft by taking his girlfriend's property. Smith reasons that he either had consent from his girlfriend to retrieve the property or intended to take the property not to deprive his girlfriend of her property, but to restore it to her.

{¶42} However, the evidence presented at trial, if believed, is sufficient to conclude that a theft offense was attempted. First, M.G. testified that he did not take Smith's girlfriend's property. Furthermore, Smith's actions of rummaging through M.G.'s pockets and patting him down are not consistent with an attempt to locate an item such as a purse. Accordingly, the jury could have inferred that M.G. was attempting to commit a theft offense of the contents of M.G.'s pockets. Moreover, M.G. testified that Smith attempted to take his watch and, in so doing, broke it. Accordingly, the State presented sufficient evidence of the underlying

attempted theft offense. Accordingly, we do not find Smith's argument that his aggravated robbery conviction was based upon insufficient evidence to be well taken. Furthermore, although Smith purports to challenge the manifest weight of his aggravated robbery conviction, the arguments presented in his appellate brief challenge only the sufficiency of the evidence. Nonetheless, when viewing the evidence in the light of the manifest-weight standard, we do not find that the jury clearly lost its way. Accordingly, we reject M.G.'s arguments challenging the sufficiency and weight of the evidence supporting his aggravated robbery conviction.

{¶43} With respect to his felonious-assault conviction, Smith does not challenge the sufficiency of the evidence supporting his conviction. Rather, Smith's argument centers around the idea that M.G.'s testimony is not reliable and that the jury lost its way by relying on that testimony. We note that "the testimony of one witness, if believed, is sufficient to establish the elements of the offense." *State v. Martinez*, 3d Dist. Union Nos. 14-19-28 and 14-19-29, 2020-Ohio-4883, ¶ 25. Moreover, "[a] verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's [evidence] rather than the defendant's version of the events." *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. Furthermore, law enforcement officers testified that various aspects of M.G.'s version of events were consistent with their findings and observations. Regardless, upon review of the record, we do not conclude that the

jury's witness-credibility determinations were unreasonable in light of the evidence presented at trial. Accordingly, the jury did not lose its way by choosing to believe M.G.'s testimony. Therefore, we conclude that Smith's felonious-assault conviction is not against the manifest weight of the evidence.

**{¶44}** Finally, Smith challenges the evidence supporting the gun specification. Smith argues that because law enforcement did not recover the gun, the jury could not make the inference that Smith had a gun and that the gun was operable. However, after reviewing the record, we find that the State provided ample evidence to support the jury's findings with respect to the firearm specification.

**{¶45}** First, M.G. testified that Smith pointed the gun at him, which prompted him to put his hands in the air. M.G. feared Smith was going to shoot him and so, he attempted to make eye contact with Smith in an effort to deescalate the situation. M.G. testified that Smith then used the firearm to strike him in the head, causing a laceration. Moreover, the emergency room physician testified that the laceration to M.G.'s head was consistent with being struck by a hard object. Furthermore, law enforcement recovered a holster and magazines concealed in the gold Nissan, which was used by Smith and Urbina to drive to M.G.'s residence. Accordingly, given the totality of the evidence, the jury did not lose its way by finding that Smith had a firearm on his person while committing the offenses and that the firearm was operable. Accordingly, we conclude that the jury's findings

relating to the firearm specification are supported by legally sufficient evidence that is not against the manifest weight of the evidence.

{¶46} Accordingly, Smith's second assignment of error is overruled.

*Conclusion*

{¶47} For the foregoing reasons, Smith's assignments of error are overruled. Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Defiance County Court of Common Pleas.

***Judgment Affirmed***

**WILLAMOWSKI, P.J. AND WALDICK, J., concur.**