[Cite as *State v. Jefferson*, 2025-Ohio-429.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

        CASE NO. 1-23-69

  v.

TOMMIE L. JEFFERSON, JR.,

        O P I N I O N

    DEFENDANT-APPELLANT.

**Appeal from Allen County Common Pleas Court**
**Trial Court No. CR2022 0328**

**Judgment Affirmed**

**Date of Decision: February 10, 2025**

**APPEARANCES:**

    *Chima R. Ekeh* for Appellant

    *John R. Willamowski, Jr.* for Appellee

**MILLER, J.**

{¶1} Defendant-appellant, Tommie L. Jefferson, Jr. ("Jefferson"), appeals the October 13, 2023 judgment of sentence of the Allen County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} On December 15, 2022, the Allen County Grand Jury indicted Jefferson on three counts: Count One of aggravated burglary in violation of R.C. 2911.11(A)(1), a first-degree felony; Count Two of kidnapping in violation of R.C. 2905.01(A)(3), a first-degree felony; and Count Three of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony. At his arraignment on December 22, 2022, Jefferson pleaded not guilty to the counts in the indictment. In accordance with Crim.R. 12.2, Jefferson filed a notice of his intent to offer evidence in support of and to argue self-defense.

{¶3} A jury trial was held on August 28 and 29, 2023. At the conclusion of the trial, the jury returned verdicts finding Jefferson not guilty of Count One (aggravated burglary), but guilty of Counts Two (kidnapping) and Three (felonious assault). With respect to the felonious assault verdict, the jury made a specific finding that Jefferson did not act in self-defense. The trial court continued the matter for sentencing and ordered a PSI.

{¶4} At the sentencing hearing held on October 12, 2023, the trial court sentenced Jefferson to an indefinite term of 9 to 13.5 years on Count Two and 5

years in prison on Count Three. The trial court ordered Counts Two and Three to be served concurrently for an aggregate sentence of 9 to 13.5 years in prison.

{¶5} Jefferson filed a notice of appeal on October 20, 2023. He raises four assignments of error for our review. For ease of discussion, we will address the first three assignments of error together.

### First Assignment of Error

**The State failed to prove beyond a reasonable doubt that Jefferson's use of non-deadly force was not in self-defense. (Tr. Pg. 476, tab 1-4)**

### Second Assignment of Error

**Appellant's conviction for felonious assault was not supported by legally sufficient evidence. (Tr. Pg. 478, tab 13-16)**

### Third Assignment of Error

**Appellant's conviction for kidnapping was against the manifest weight of the evidence. (Tr. Pg. 478, tab 13-16)**

{¶6} In his first assignment of error, Jefferson contends that the State failed to prove that his use of non-deadly force was not in self-defense. In his second assignment of error, Jefferson argues that his conviction for felonious assault was not supported by sufficient evidence. In his third assignment of error, Jefferson alleges that his kidnapping conviction was against the manifest weight of the evidence.

*Standards of Review*

**{¶7}** Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997), *superseded by statute on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, we address each legal concept individually.

**{¶8}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 2013-Ohio-4775, ¶ 33 (1st Dist.).

**{¶9}** On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[w]eigh the evidence and all reasonable inferences, consider[] the credibility of witnesses and determine[] whether in resolving conflicts in the evidence, the [trier

of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

*Jefferson's Convictions*

{¶10} Jefferson was found guilty of kidnapping and felonious assault. The offense of kidnapping is codified in R.C. 2905.01 which provides, in relevant part: "No person, by force, threat, or deception . . . shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: [t]o terrorize, or to inflict serious physical harm on the victim or another[.]" R.C. 2903.11(A)(3).

{¶11} Jefferson was also convicted of felonious assault under R.C. 2903.11(A)(1) which provides that "No person shall knowingly . . . [c]ause serious physical harm to another[.]"

"Serious physical harm to persons" means any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5)(a)-(e). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Additionally, "[a] person has knowledge of circumstances when the person is aware that such circumstances probably exist." *Id.*

{¶12} Jefferson attempted to assert self-defense with respect to the felonious assault charge. R.C. 2901.05(B)(1), states as follows:

A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

"Under R.C. 2901.05(A) and (B)(1), a defendant claiming self-defense has the burden of production—that is, the burden of producing evidence that 'tends to support' his use of force in defending himself." *State v. Estelle*, 2021-Ohio-2636, ¶ 18 (3d Dist.). "Under the current version of R.C. 2901.05, if evidence is presented 'that tends to support' that the defendant used the force in self-defense, the *prosecution* must prove beyond a reasonable doubt that the accused did not act in self-defense." (Emphasis sic.) *State v. Flory*, 2020-Ohio-5136, ¶ 43 (3d Dist.). Accordingly, "the burden of *proof* for . . . self defense has shifted to the state," but "the burden of *production* for . . . self defense[] remains with the defendant." (Emphasis sic.) *State v. Messenger*, 2021-Ohio-2044, ¶ 44 (10th Dist.).

**{¶13}** "The elements of a self-defense claim differ based on whether the defendant employed deadly or non-deadly force to defend against their perceived assailant." *State v. Crowe*, 2019-Ohio-3986, ¶ 15 (3d. Dist.).

Self-defense through the use of non-deadly force is present where:

(1) the accused is not at fault in creating the situation giving rise to the affray, (2) the accused (even if mistaken) had a bona fide belief that he was in imminent danger of any bodily harm; and (3) the only means to protect himself from such danger was the use of force not likely to cause death or great bodily harm.

*State v. Chavez*, 2020-Ohio-426, ¶ 40 (3d Dist.); *Ohio Jury Instructions*, CR Section 421.19 (Rev. Apr. 6, 2021).

**{¶14}** "[T]he State must 'disprove at least one of the elements of self-defense beyond a reasonable doubt.'" *State v. Passmore*, 2023-Ohio-3209, ¶ 29 (3d Dist.),

quoting *State v. Carney*, 2020-Ohio-2691, ¶ 31 (10th Dist.). "The elements of self-defense are cumulative, and a defendant's claim of self-defense fails if any one of the elements is not present." *State v. Ridley*, 2022-Ohio-2561, ¶ 15 (1st Dist.).

{¶15} At trial, the court gave the jury the following instructions relating to self-defense:

SELF-DEFENSE

In this case, the defendant claims that he acted in self-defense in committing assault on [S.E.]. The defendant is allowed to use non-deadly force in self-defense. The state must prove beyond a reasonable doubt that the defendant did not use non-deadly force in self-defense.

To prove that the defendant did not use non-deadly force in self-defense, the state must prove beyond a reasonable doubt at least one of the following:

(A) the defendant was at fault in creating the situation giving rise to his use of non-deadly force; or

(B) the defendant did not have reasonable grounds to believe that he was in immediate danger of bodily harm; or

(C) the defendant did not have an honest belief, even if mistaken, that he was in immediate danger of bodily harm; or

(D) the defendant used unreasonable force.

There is no requirement that the jury be unanimous as to which of the above you believe the State disproved.

(Doc. No. 88); (Aug. 28-29, 2023 Tr. at 453-454).

*Trial Testimony*

{¶16} S.E. testified that she was in a relationship with Jefferson for approximately four years, but that on September 4, 2022 she and Jefferson were no longer in a relationship and, she was living alone at 1105 Sherman Avenue. (Aug. 28-29, 2023 Tr. at 219-222). She clarified that Jefferson had never lived in the Sherman Avenue residence with her; however, he had a key to the house that he had "stole[n]" from her. (*Id.* at 221).

{¶17} According to S.E., on the evening of September 3, 2022, she worked at a local bar until approximately 1:30 a.m. on September 4, 2022. (Aug. 28-29, 2023 Tr. at 222-223); (State's Ex. No. 1). After leaving, she drove to Sportscasters, a bar located in Lima, Ohio, for a friend's birthday celebration. (Aug. 28-29, 2023 Tr. at 223-224). S.E. testified that Jefferson was also at Sportscasters for the same birthday celebration, but he was present prior to her arrival and she was not aware that Jefferson would be there. (*Id.* at 224-225). S.E. recalled that she and Jefferson got into an argument at Sportscasters where Jefferson yelled at her, prompting her to leave the bar and go home. (*Id.* at 225-226).

{¶18} S.E. stated that, upon returning home, she fell asleep on the couch and, at approximately 3:00 a.m. to 4:00 a.m., awoke to Jefferson coming into her house, yelling and screaming at her. (Aug. 28-29, 2023 Tr. at 226-227, 229). S.E. denied that she and Jefferson made plans for him to come over and stated that Jefferson entered the residence with the stolen key. (*Id.* at 227-228).

{¶19} S.E. recalled that Jefferson got on top of her and began hitting her while he continuing yelling and screaming. (Aug. 28-29, 2023 Tr. at 226-228). She stated that he hit her face and head "a lot" and called her derogatory names. (*Id.* at 228-229).

{¶20} According to S.E., Jefferson stayed on top of her on the couch for "hours." (*Id.* at 229). During this time, S.E. recalled asking Jefferson to get off of her. (*Id.* at 229-230). At some point, Jefferson put his arms around S.E.'s neck and chocked her, prompting S.E. to reach up to try to push him off. (*Id*. at 130). While trying to get Jefferson's arms off of her neck, S.E.'s finger went into Jefferson's mouth and he bit her finger "hard," drawing blood. (*Id.* at 229-231).

{¶21} S.E. testified that when she tried to move Jefferson off of her, he would push her back onto the couch. (Aug. 28-29, 2023 Tr. at 231). S.E. explained that her right arm is very weak, and she has undergone multiple surgeries on her right arm. (*Id.* at 249-250). S.E. testified that the surgeries affect her ability to lift and significantly reduce the strength in her right arm. (*Id.* at 250). S.E. stated that her diminished arm strength played a role in her inability to get Jefferson off of her. (*Id.* at 230).

{¶22} Despite this, S.E. continued to try to get away from Jefferson and escape from her house, but Jefferson was always positioned between her and the door. (*Id.* at 229). In one such instance, she recalled Jefferson throwing something which broke the globe on the ceiling fan in the nearby kitchen. (*Id.* at 231-232).

S.E. stated that she tried to sweep up the mess and recalled that Jefferson positioned himself between her and the door and told her that she was not leaving. (*Id.* at 231-233). S.E. testified that Jefferson was afraid that she would call the police and that he would be arrested. (*Id.* at 233). According to S.E., Jefferson threatened to kill her if she called the police. (*Id.*).

**{¶23}** S.E. stated that, towards the end of the incident, S.E. tried to talk to Jefferson to calm him down. (Aug. 28-29, 2023 Tr. at 233-234). She testified that her goal was to get him calm enough to allow her to escape. (*Id.* at 234). S.E. admitted that, in an effort to calm Jefferson down so she could get away, she had sex with him. (*Id.*). After, Jefferson fell asleep and S.E. was able to escape. (*Id.*).

**{¶24}** Shortly after leaving the house, S.E. called the police. (Aug. 28-29, 2023 Tr. at 235). A recording of that call was introduced as State's Exhibit 2 and played for the jury. (*Id.*). When the police arrived at her residence, Jefferson was no longer there and was not arrested that day. (*Id.* at 236).

**{¶25}** Photographs taken on September 4, 2022 of the inside of S.E.'s home depicting the broken glass globe from the ceiling fan and blood on the carpet by the couch in the living room were also introduced at trial. (*Id.* at 242-244). S.E. testified that the blood came from the bite on her finger. (*Id.* at 244).

**{¶26}** S.E. recalled that on September 4, 2022, she went to the sheriff's department where she gave a "full statement" to the detective. (*Id.* at 244-245). S.E. testified that she was truthful when giving her statement to the detective. (*Id.*

at 245). However, she admitted that she did not tell the detective that she had sex with Jefferson during the encounter because she was "embarrassed." (*Id.*).

**{¶27}** Later that day, S.E. was treated at St. Rita's Hospital for a ruptured eardrum, bite injury to her finger, and bruising. (Aug. 28-29, 2023 Tr. at 245-246). State's Exhibits 3 through 14, photographs of S.E.'s injuries taken on September 4, 2022, were introduced at trial. (Aug. 28-29, 2023 Tr. at 237-241). Several photographs depicted bruising around S.E.'s eyes and nose and on her chest and neck. (*Id.* at 239-240); (State's Ex. Nos. 3, 4, 5, 6, 7, 8, 9, 10, 11, 12). The photographs also depicted injury to S.E.'s finger. (Aug. 28-29, 2023 Tr. at 240-241); (State's Ex. Nos. 13, 14). S.E. testified that she did not have the injuries prior to the incident with Jefferson on September 4, 2022. (Aug. 28-29, 2023 Tr. at 246). S.E. said the ruptured eardrum caused a loss of hearing and a "lot of pain" which lasted for nearly two months. (*Id.*).

**{¶28}** S.E. stated that Jefferson was eventually arrested for the incident and she testified at a preliminary hearing. (*Id.* at 256-257). S.E. conceded that, at that hearing, she did not mention that she had gone to Sportscasters after leaving work. (*Id.* at 247). S.E. explained that her time at the bar "didn't have anything to do" with what happened between her and Jefferson later that night and that she was "exhausted." (*Id.* at 247, 256-257). On cross-examination, S.E. admitted that, until recently, she denied having sex with Jefferson on the night of the incident. (*Id.* at 253). On redirect examination, S.E. explained that when she had sex with Jefferson

she "definitely didn't want to", but he had been in her house for hours, struck her, and strangled her, and she was hoping to calm Jefferson down so that she could get away. (*Id.* at 267-268). S.E. stated, "I mean, when you've been through that, you kind of do whatever it takes to get away." (*Id.* at 267).

{¶29} S.E. also testified that approximately one month before the incident with Jefferson, she was in a car accident where her head struck the windshield. (*Id.* at 247-248, 259-260). As a result of that accident, she had a "big knot" on her forehead and "two big black eyes." (*Id.* at 248). She stated that the black eyes were visible for some time, but specified that the black eyes she sustained in the car accident were "[a]bsolutely not" still present on September 4, 2022. (*Id.* at 248, 260-261). The State introduced a photograph of S.E. which she testified was taken on September 3, 2022, the day before the incident. (*Id.* at 248-249); (State's Ex. No. 24).

{¶30} S.E. admitted that she did not mention the car accident or any related injuries when she received medical treatment following the September 4, 2022 incident with Jefferson. (Aug. 28-29, 2023 Tr. at 262). S.E. explained that the car accident was not a "secret" and she did not have anything to hide, but that she did not think that it was relevant. (*Id.* at 263).

{¶31} Deputy Chance Flynn ("Deputy Flynn") was on duty with the Allen County Sheriff's Office on September 4, 2022 when he responded to a call for service at approximately 4:45 p.m. at 1105 Sherman Avenue. (Aug. 28-29, 2023

Tr. at 272-273). Deputy Flynn recalled that when he made contact with S.E., she appeared "terrified" and "gave the impression that she had just been through something traumatic." (*Id.* at 274). Deputy Flynn stated that her voice and hands were both "shaky," her eyes were "dartin[g] around," and she "seemed terrified" to get close to her residence because she believed Jefferson may still be there. (*Id.*). Deputy Flynn noticed bruising on both of her eyes, swelling on the tip of her nose, bruising on her neck, and a laceration to her finger. (*Id.* at 276-277).

{¶32} Casey Counts ("Counts"), a nurse practitioner at St. Rita's Hospital, testified that he provided medical treatment to S.E. in the emergency room on September 4, 2022. (Aug. 28-29, 2023 Tr. at 281-283). Specifically, Count treated S.E. for tympanic membrane (eardrum) rupture on her right ear, black eyes, and a human bite. (*Id.* at 286-289); (State's Ex. No. 21).

{¶33} Counts testified that, at the time that he treated S.E. on September 4, 2022, he would have had her entire medical record available to him, including S.E.'s medical records from her visit to the emergency room following the car accident in early August 2022; however, he does not recall whether he looked at the entire medical record on September 4, 2022. (Aug. 28-29, 2023 Tr. at 299-300). When asked on redirect examination if knowledge that S.E. had been involved in a car accident a month prior to treatment would have changed anything about his diagnosis, Counts replied "[p]robably not. . . [a] month is a very long time." (*Id.* at 301).

**{¶34}** Detective Russ Hunlock ("Detective Hunlock"), a detective with the Allen County Sheriff's Office, testified that on September 4, 2022, he responded to 1105 Sherman Avenue for a report of an assault. (*Id.* at 315-316). Detective Hunlock recalled that Jefferson, the suspect, was not located on September 4, 2022, but was subsequently arrested on November 5, 2022. (*Id.* at 317-318).

**{¶35}** Detective Hunlock testified that, during the course of his investigation, he learned that S.E. had been involved in a car accident approximately one month before the September 4, 2022 incident. (*Id.* at 331-332). However, he did not investigate the car accident because he did not believe the accident was relevant to the events of September 4, 2022. (*Id.* at 332, 335).

**{¶36}** According to Detective Hunlock, he learned about the meeting at Sportscasters from reviewing the recordings of the jail communications between S.E. and Jefferson. (Aug. 28-29, 2023 Tr. at 335-336). However, he did not feel that the events at Sportscasters had any relevance to the later events, which occurred at S.E.'s residence. (*Id.* at 337-338).

**{¶37}** Jefferson testified in his own defense. (*Id.* at 354). Jefferson reported that he is approximately 6 feet 2 inches tall and weighs nearly 300 pounds. (*Id.* at 381). He stated that he and S.E. had been in a relationship beginning in 2019 and, on September 4, 2022, he and S.E. were in a relationship and living together at 1105 Sherman Avenue. (*Id.* at 356-357).

{¶38} According to Jefferson, on September 4, 2022, he met S.E. and some mutual friends at Sportscasters for a friend's birthday celebration. (Aug. 28-29, 2023 Tr. at 361). He testified that when he arrived at Sportscasters, S.E. was already there. (*Id.* at 362). When S.E. left the bar at approximately 2 a.m., she left her car in the parking lot and traveled with some mutual friends to another friend's residence. (*Id.* at 362-363). Jefferson drove separately, but met up with S.E. at the residence. (*Id.* at 363). While there, a woman approached Jefferson and attempted to flirt with him. (*Id.* at 364-365). However, Jefferson informed the woman that he was with S.E. and ended the conversation. (*Id.* at 365). Jefferson and S.E. remained at the residence for another 30 to 35 minutes before leaving together. (*Id.* at 365-366). After leaving the friend's residence together, Jefferson and S.E. retrieved her car from Sportscasters. (*Id.* at 366). Then, they returned together to their Sherman Avenue residence. (*Id.* at 367-368).

{¶39} Jefferson testified that when they returned home, S.E. went to the kitchen while Jefferson sat on the couch in the nearby living room. (*Id.* at 368-370). From the kitchen, S.E. started to repeatedly question Jefferson about the woman who flirted with him at the friend's house. (*Id.* at 370-372). Jefferson stated that he eventually started to ignore S.E., which irritated her. (*Id.* at 372). S.E. then asked Jefferson "You don't hear me talkin[g]?" and S.E. slapped Jefferson in the face. (*Id.* at 372-373). After she smacked him, Jefferson stood up to "create some space" between them. (*Id.* at 373).

{¶40} Jefferson recalled that, as he bent down to pick up some items from the ground, he felt a sting, which was S.E. scratching his forehead. (Aug. 28-29, 2023 Tr. at 373-374). Jefferson stated that the injury to his forehead was "bleeding bad" and that the blood on the carpet in the photographs was his. (*Id.* at 374).

{¶41} After scratching Jefferson, S.E. continued to run around the house while Jefferson called her "stupid" and threatened her. (*Id.* at 374-375). At some point, Jefferson told S.E. "get away from me, you're stupid" and, then, S.E. put her finger in his mouth and he bit it. (*Id.* at 375). Although Jefferson admitted to biting S.E.'s finger, he denied grabbing her, pushing her away, or hitting her. (*Id.* at 377-378).

{¶42} Jefferson stated that he then sat down on the couch and S.E. recognized that Jefferson was "bleedin[g] hard" and calmed down. (Aug. 28-29, 2023 Tr. at 376). S.E. then got a warm rag and they talked about the situation, specifically how S.E. had let the other woman come between them. (*Id.* at 376-377). Jefferson then chastised S.E. for "reactin[g] to certain things and . . . situations like she does." (*Id.* at 377). Jefferson and S.E. watched a television show together until S.E. went to bed. (*Id.* at 377-378). Shortly thereafter, Jefferson followed, at S.E.'s request. (*Id.* at 378). The following morning, S.E. left to get breakfast, and Jefferson told her that he would stay at the house. (*Id.* at 379-380). However, he left for the laundry mat before S.E. returned with their food. (*Id.*).

{¶43} Jefferson's counsel introduced Defendant's Exhibit A and Defendant's Exhibit B, which Jefferson identified as photographs of S.E. taken following the car accident in early August 2022. (Aug. 28-29, 2023 Tr. at 358-359); (Defendant's Ex. Nos. A, B). The photographs depicted S.E. with large dark circles on her eyes that were described as "raccoon eyes." (Aug. 28-29, 2023 Tr. at 358); (Defendant's Ex. Nos. A, B). Jefferson said that it took over a month for the black eyes from the car accident to heal and that S.E. attempted to cover up the black eyes with make-up when she was in public. (Aug. 28-29, 2023 Tr. at 360-361).

*Analysis*

{¶44} In Jefferson's first assignment of error, he argues that the jury erred by rejecting his self-defense claim with respect to his felonious assault conviction. In his second assignment of error, Jefferson argues that his felonious assault conviction was not based on sufficient evidence. In his third assignment of error, Jefferson argues that his kidnapping conviction was against the manifest weight of the evidence.

{¶45} First, we note that although Jefferson's first two assignments of error purport to challenge the sufficiency of the evidence, his arguments actually challenge the credibility of the witnesses and, consequently, the weight of the evidence.

{¶46} In his first three assignments of error, Jefferson argues that S.E. was not credible and that the jury erred by finding her version of events more credible

than his. Specifically, Jefferson challenges S.E.'s omissions and inconsistent statements through the pendency of the case. In particular, Jefferson notes S.E.'s lack of candor that she and Jefferson had sexual relations on the night of the incident, and her initial omission that she saw Jefferson at Sportscasters. Jefferson also argues that her injuries were caused not by a physical altercation on September 4, 2022, but as a result of a car accident.

**{¶47}** The inconsistencies in S.E.'s statements were raised at trial and would have been known to the jury; indeed, the inconsistencies in S.E.'s statements were a keystone of the defense's case. However, the jury still chose to believe S.E.'s testimony over Jefferson's version of events.

**{¶48}** "A verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's [evidence] rather than the defendant's version of the events." *State v. Martinez*, 2013-Ohio-3189, ¶ 16 (9th Dist.). "'Although we review credibility when considering the manifest weight of the evidence, the credibility of witnesses is primarily a determination for the trier of fact.'" *State v. Cox*, 2022-Ohio-571, ¶ 20 (3d Dist.), quoting *State v. Banks*, 2011-Ohio-5671, ¶ 13 (8th Dist.), citing *DeHass*, 10 Ohio St.2d, at paragraph one of the syllabus. "'The trier of fact is best able to "view the witnesses and observe their demeanor, gestures[,] and voice inflections, and use these observations in weighing the credibility of the proferred testimony.'''" *State v. Brentley*, 2023-Ohio-2530, ¶

33 (3d Dist.), quoting *Banks* at ¶ 13, quoting *State v. Wilson*, 2007-Ohio-2202, ¶ 24, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80-81 (1984).

**{¶49}** Notably, the jury had the opportunity to observe S.E. and Jefferson testify at trial.[1] Based upon our review of the record, it is clear that the jury found S.E. to be more credible. "[I]t is within the province of the jury to parse out the credible portions of witnesses' testimonies." *State v. Waller*, 2023-Ohio-493, ¶ 20 (3d Dist.). The record sufficiently supports the jury's credibility assessments, and we find no basis to alter its analysis.

**{¶50}** Furthermore, in reviewing the evidence presented at trial, S.E.'s testimony was corroborated by multiple sources. For instance, Deputy Flynn testified that S.E. appeared "terrified" and "gave the impression of someone who had just been through something traumatic." (Aug. 28-29, 2023 Tr. at 274). Additionally, S.E.'s injuries were consistent with her version of events, but were not consistent with Jefferson's testimony. Specifically, Jefferson's testimony provides no cause for the ruptured ear drum and does not explain the bruising on S.E.'s chest, neck, and arm.

**{¶51}** S.E. admitted she did not initially tell law enforcement she had sexual relations with Jefferson on the night of the incident. S.E. explained that she had sex with Jefferson in an effort to calm him down and escape from the situation, not

---

[1] The record indicates that the victim's body language and demeanor may have, indeed, had an impact on the jury. At the sentencing hearing, the State noted that, at trial, S.E. was "notably shaking on the stand" and "couldn't even look at the defendant." (Oct. 12, 2023 Tr. at 3-4).

because she wanted to. S.E. testified that the reason she did not initially disclose she had sex with Jefferson that night is because she was embarrassed.

{¶52} At trial, S.E. also admitted that she did not initially tell investigators that she stopped at Sportscasters, where she first saw Jefferson, before coming home. S.E. offered several explanations including that she was exhausted and may have forgotten and that she did not think it was relevant. Detective Hunlock testified that he did not believe the interaction at Sportscasters had any relevance to the events that later occurred at S.E.'s house.

{¶53} While S.E. did not initially tell investigators or the care providers at the emergency room about the car accident, she explained that she did not mention the car accident because it had happened over one month prior, her injuries had healed, and she did not think that it was relevant. Detective Hunlock testified that when he learned about the car accident, he did not investigate it because he did not think that it was relevant to the events of September 4, 2022. Counts, the emergency room nurse practitioner who provided medical treatment for S.E. on September 4, 2022, stated nothing about his diagnosis would have changed if he had knowledge that S.E. had been involved in a car accident one month prior. (Aug. 28-29, 2023 Tr. at 301).

{¶54} Furthermore, with respect to his kidnapping conviction, Jefferson argues that S.E.'s argument that Jefferson restrained her was belied by the fact that she voluntarily had sexual intercourse with Jefferson. He argues that because S.E.

had sex with Jefferson, he did not restrain her in a manner sufficient for a conviction for a kidnapping conviction. However, Jefferson's argument is undermined by S.E.'s statements that she did not want to have sexual relations with Jefferson and only did so in an effort to calm him down enough for her to get away. She stated that the sex act occurred only after she had been restrained by Jefferson for hours and was desperate to escape. Additionally, S.E.'s ability to escape and defend herself was compromised by her weakened right arm.

{¶55} Although Jefferson testified that his actions were made in self-defense, as triers of fact, the jurors were free to believe all, some or none of the testimony provided by S.E. *State v. Reed*, 2024-Ohio-4838, ¶ 48 (3d Dist.). Indeed, the jury acquitted Jefferson of aggravated burglary, which may indicate they did not find all of S.E.'s testimony credible. Further, S.E.'s testimony, if believed, was sufficient to establish each of the elements of the relevant offenses. Having examined the record, we do not conclude that the jury lost its way when it returned guilty verdicts with respect to the felonious assault and kidnapping charges. Further, we do not conclude that the jury lost its way when it returned a verdict concluding that Jefferson's actions were not in self-defense. *See State v. Passmore*, 2023-Ohio-3209, ¶ 39-40 (3d Dist.). Accordingly, Jefferson's first, second, and third assignments of error are overruled.

**Fourth Assignment of Error**

**The trial court erred by failing to merge Appellant's sentence for kidnapping and felonious assault. (Sentencing Tr. pg. 7, tab 22-23)**

{¶56} In his fourth assignment of error, Jefferson argues that the trial court erred by failing to merge his kidnapping and felonious assault convictions for purposes of sentencing. He maintains that the two offenses were committed with the same animus.

*Allied-Offenses Review*

{¶57} We review de novo whether offense are allied offenses of similar import. *State v. Tall*, 2023-Ohio-1853, ¶ 7 (3d Dist.). "De novo review is independent, without deference to the lower court's decision." *State v. Hudson*, 2013-Ohio-647, ¶ 27 (3d Dist.).

R.C. 2941.25, Ohio's multiple-count statute, provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶58} The Supreme Court of Ohio has directed the use of a three-part test to determine whether a defendant can be convicted of multiple offenses:

As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? And (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*State v. Ruff*, 2015-Ohio-995, ¶ 31.

**{¶59}** "[T]wo or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at ¶ 23. "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." *Id.* at ¶ 26. "[A] defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *Id.*

**{¶60}** The term "animus" means "purpose or, more properly, immediate motive." *State v. Logan*, 60 Ohio St.2d 126, 131 (1979), abrogation recognized in *Ruff*. "Like all mental states, animus is often difficult to prove directly, but must be inferred from the surrounding circumstances." *Id.* "Thus, the manner in which a defendant engages in a course of conduct may indicate distinct purposes." *State v. Whipple*, 2012-Ohio-2938, ¶ 38 (1st Dist.). "Courts should consider whether facts appear in the record that 'distinguish the circumstances or draw a line of distinction

that enables a trier of fact to reasonably conclude separate and distinct crimes were committed.'" *Id.*, quoting *State v. Glenn*, 2012-Ohio-1530, ¶ 9 (8th Dist.).

**{¶61}** "'[T]he primary question when determining whether kidnapping merges with another offense "is whether the restraint or movement of the victim is merely incidental to a separate underlying crime or, instead, whether it has a significance independent of the other offense."'" *State v. Killingsworth*, 2020-Ohio-724, ¶ 17 (3d Dist.), quoting *State v. Morris*, 2016-Ohio-5490, ¶ 17 (1st Dist.), quoting *State v. Logan*, 60 Ohio St.2d 126, 135 (1979).

*Analysis*

**{¶62}** After reviewing the facts, we do not find that the trial court erred in its determination that the felonious assault and kidnapping did not merge for the purpose of sentencing. At trial, S.E. testified that Jefferson repeatedly struck her, chocked her, and bit her finger. At some point during the initial assault, Jefferson ruptured her ear drum. He also sat on S.E., rendering her unable to leave for approximately 12 hours. S.E. testified that Jefferson expressed that he did not want to let her go because he was afraid that she would report the assault to law enforcement. During this time, S.E. made several attempts to get away from Jefferson, but she was unsuccessful. Eventually, she engaged in sex with Jefferson in an effort to calm him down enough to escape, which was ultimately successful.

**{¶63}** Taken together, the totality of the evidence establishes that the felonious assault and kidnapping were committed with separate animus and

motivation. Notably, the prolonged nature of the restraint indicates that the restraint is not merely incidental to the felonious assault, but involves a separate animus from the felonious assault. *See Morris* at ¶ 17 "[W]here the restraint is prolonged, the confinement is secretive or the movement is substantial, the kidnapping and aggravated robbery offenses are committed with a separate animus."). Furthermore, the felonious assault and kidnapping appeared to have different motives—to injure and to terrorize and prevent S.E. from contacting law enforcement, respectively. Accordingly, the trial court did not err by determining that Jefferson's convictions were not allied offenses of similar import.

**{¶64}** Jefferson's fourth assignment of error is overruled.

*Conclusion*

**{¶65}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Allen County Court of Common Pleas.

***Judgment Affirmed***

**ZIMMERMAN and EPLEY, J.J., concur.**

**\*\* Judge Christopher B. Epley of the Second District Court of Appeals, sitting by Assignment of the Chief Justice of the Supreme Court of Ohio.**