[Cite as *State v. Jones*, 2014-Ohio-674.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 12AP-1091 |
| v. | : | (C.P.C. No. 11CR-08-4160) |
| Horatio A. Jones, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on February 25, 2014

*Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee.

*Kirk A. McVay*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

CONNOR, J.

{¶ 1} Defendant-appellant, Horatio A. Jones, appeals from his conviction of two counts of rape of a child less than the age of 13, a violation of R.C. 2907.02.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On July 1, 2011, A.D. brought her 12-year-old daughter D.L. to Nationwide Children's Hospital Center for Family Safety and Healing for a physical examination. A.D. suspected that her daughter had been sexually molested by defendant, her live-in boyfriend of four years. Kerri Wilkinson, a licensed social worker specially trained to interview children, conducted an interview with D.L. During the interview, D.L. revealed that defendant had placed his mouth on her vagina on five separate occasions from April to June 2011.

{¶ 3}   Detective Lisa McKissick of the Columbus Division of Police Sexual Assault Squad, and pediatric nurse Gail Hornor, viewed the interview from another location. Detective McKissick subsequently contacted defendant by telephone and informed him of the allegations, which he denied.  At her request, defendant arrived at police headquarters for an interview on July 11, 2011, and he continued to deny the allegations.  On July 27, 2011, defendant voluntarily submitted to a polygraph examination conducted by Les Gloege.  When the test was finished, Gloege informed defendant that the test results revealed deception on his part.  Gloege advised defendant to admit his guilt.

{¶ 4}   Although defendant continued to deny the allegations for a short time, he eventually told Gloege in words to the effect that he wanted to "get this over with."  (Tr. Vol. II, 95.)  Defendant then admitted he performed cunnilingus on D.L. five or six times. Gloege committed defendant's statement to writing and defendant signed the written statement.

{¶ 5}   After speaking with Gloege, Detective McKissick contacted defendant by telephone and he told her that his written statement was truthful.  Defendant voluntarily appeared at police headquarters on July 29, 2011 where Detective McKissick placed him under arrest.  Although defendant received *Miranda*[1] warnings and asked for legal counsel, he once again admitted that he had, on several occasions, performed cunnilingus on D.L.

{¶ 6}   Defendant was charged with five counts of rape of a child less than the age of 13, a violation of R.C. 2907.02.  Defendant initially entered a plea of not guilty as to all counts.   On January 11, 2012, the trial judge ordered defendant to undergo an examination for the purposes of determining whether he was competent to stand trial. The trial court scheduled a competency hearing for April 30, 2012.  Jaime C. Adkins, Psy.D., of NetCare Forensic Center ("NetCare"), examined defendant and she opined that defendant was not mentally retarded and he was competent to stand trial.

{¶ 7}   On April 17, 2012, defendant changed his plea to not guilty by reason of insanity ("NGRI"), whereupon the trial court referred him to NetCare for a determination of his mental condition at the time of the offenses.  After re-examining defendant, Dr.

Adkins determined that defendant was not suffering from a severe mental disease or defect at the time of the offenses, and that he was able to appreciate the wrongfulness of his conduct. Defendant asked for and received a second opinion on the issue of his sanity. Robert Stinson, Psy.D., examined defendant for that purpose but defendant did not submit a written report from Dr. Stinson.

{¶ 8} As a result of the April 30, 2012 hearing, the trial court found defendant both competent to stand trial and legally sane. A jury convicted defendant of two of the five counts of rape; specifically, the offenses that occurred on June 18 and 30, 2011.

## II. ASSIGNMENTS OF ERROR

{¶ 9} Defendant appeals to this court assigning the following two assignments of error:

> [I.] THE TRIAL COURT ABUSED ITS DISCRETION, DEPRIVING DEFENDANT-APPELLANT OF HIS RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION WHEN IT DENIED DEFENDANT-APPELLANT'S MOTION FOR MISTRIAL AFTER THE PROSECUTOR IMPROPERLY INTRODUCED EVIDENCE THAT DEFENDANT-APPELLANT HAD TAKEN A POLYGRAPH IN THE COURSE OF THE INVESTIGATION OF THIS CASE.

> [II.] THE TRIAL COURT ERRED, DEPRIVING DEFENDANT-APPELLANT OF HIS RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENT[S] TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION WHEN IT FAILED TO INSTRUCT THE JURY REGARDING DEFENDANT-APPELLANT'S PLEA OF NOT GUILTY BY REASON OF INSANITY.

## III. STANDARD OF REVIEW

{¶ 10} The decision whether or not to grant a mistrial rests in a trial court's sound discretion. *State v. Glover,* 35 Ohio St.3d 18 (1988). In order to find an abuse of

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

discretion, we must determine if the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore,* 5 Ohio St.3d 217 (1983).

{¶ 11} Similarly, "[i]t is within the sound discretion of a trial court to refuse to admit proposed jury instructions which are either redundant or immaterial to the case." *Bostic v. Connor,* 37 Ohio St.3d 144 (1988), paragraph two of the syllabus. However, where a requested jury instruction is a correct statement of the law as applied to the facts of the case, the trial court should give the requested instruction. *Murphy v. Carrollton Mfg. Co.,* 61 Ohio St.3d 585, 592 (1991). Accordingly, the standard of review for an appellate court is whether the trial court abused its discretion by refusing to give a requested jury instruction under the particular facts and circumstances of the case. *State v. Stewart,* 10th Dist. No. 10AP-526, 2011-Ohio-466, ¶ 9, citing *State v. Wolons,* 44 Ohio St.3d 64, 68 (1989).

## IV. LEGAL ANALYSIS

### A. Polygraph Evidence

{¶ 12} In pretrial proceedings upon defendant's motion to suppress, the parties argued whether Gloege's July 27, 2011 videotaped interview of defendant should be admitted into evidence. Defense counsel requested the admission of only that portion of the videotape recorded after the polygraph. He asserted that "the jury needs to hear" this evidence. (Tr. Vol. II, 116.) He did object, however, to any references to the polygraph examination in that portion of the videotape. The prosecutor agreed to redact two references to the polygraph examination and provide defense counsel with a copy of the redacted videotape prior to trial. Based upon this agreement, the videotape was admitted into evidence.

{¶ 13} At trial, the prosecutor played the videotape for the jury. During one portion of the videotaped interview, Gloege made the statement: "Well, I want your honest opinion, though, what you believe it was, because *we can always test her too* if we need to." (Emphasis added.) (Tr. Vol. III, 378-79.) Later in the video, as defendant is being asked to sign a document, Gloege is heard saying to defendant, "this part down here,

basically, *this says when the test is over*, and the time is 2:33."  (Emphasis added.)  (Tr. Vol. III, 382-83.)

{¶ 14}  At the conclusion of the videotape, defense counsel, Mr. Vogel, approached the bench and the following discussion took place:

> [DEFENSE COUNSEL:]  I didn't catch it. Mr. Parry tells me he did. That at the end of the interview, that Mr. Gloege mentions that he came in to do the test, and I think that it is at least a reference to the polygraph.
>
> I think it's a reference to why he was there. I think that we need to move for a mistrial at this point.
>
> [PROSECUTOR:]  I don't disagree that that was in there. I missed it when I went through to get rid of the things, and it is there, so I don't know what the Court wants to do with that.
>
> I mean, I guess, my hope, you know, if defense counsel missed it, then if we don't draw any attention to it, that it wouldn't be an issue.
>
> THE COURT:  We will proceed. The motion at this point is overruled. We'll talk about it on the record later, out of the hearing of the jury, but at this point we'll proceed. We will proceed.

(Tr. Vol. III, 384-85.)

{¶ 15}  Thereafter, defendant took the witness stand in his own defense.  When his defense counsel, Mr. Vogel, asked him why he falsely confessed to the crimes, he answered:

> [DEFENDANT:]  'Cause the reason I did that, at first, the lady - - the detective, she gave me - - talked to me about stuff and I said no. We set up appointment for the - - to take the - -
>
> [DEFENSE COUNSEL:]  Okay.
>
> [DEFENDANT]  - - the test, the test.

(Tr. Vol. IV, 481-82.)

{¶ 16}  Later, in his direct examination, when defendant was asked by his counsel why he believed that Detective McKissick had lied to him, he responded:

I asked for a lawyer, and you chop me up, right, so that's fine. So when I was going to take a test, she should have said to me, Mr. Jones, I think you need a lawyer. You get what I'm saying?

\* \* \*

Before I went to go take the test, she told me if you - - if you miss appointment or - - I put a lot of guys in for missed appointment, go straight to jail, so I'm a big idiot. I'm not even thinking, whatever, da-da-da-da-da-da. I hear the word "jail," I'm going okay. I believe that because I make appointment to go, so I'm going to go. I go there, and I'm stupid because the guy is reading stuff that - - [.]

(Tr. Vol. IV, 484-85.)

{¶ 17} Finally, when defense counsel asked on redirect why he did not have a lawyer with him on July 27, 2011, defendant replied as follows:

- - Mr. Gloege, I thought I didn't need any lawyer to do the test; but when I got there, to do the test, I couldn't leave because after she - - he read all that stuff, there's no way out, and they wouldn't let me leave to try to go to get a lawyer or whatever 'cause they would arrest me.

(Tr. Vol. IV, 538.)

{¶ 18} Following the submission of the case to the jury, defendant renewed his motion for a mistrial, whereupon the trial court made the following ruling:

THE COURT: I agree with what you are saying there, Mr. Vogel, but I don't know, you know, at what point in time the jury - - the juror that wrote that question that was not asked, that is being retained for the record, at what point in the proceedings of the testimony they thought of that question and wrote it down.

The initial mentioning of it on the tape, where he said "the test," just passed - - I mean, it could have been any type of test, although no one argued about it or amplified it until Mr. Jones got on the stand, and Mr. Jones did talk about the test, the test, and that - - without a doubt - - just being realistic, our jurors, as you had stated earlier, are not necessarily shrinking violets, so I would expect them to surmise that we're talking about a polygraph.

> Now, whether that's attributable to Mr. Jones mentioning it during the course of his examination or whether it was from that initial snippet, my feeling at this time is that it was from Mr. Jones' testimony that it was really amplified, and he hesitated, especially after he mentioned it, you tried to close it down as quickly as you could, and I may have even reacted a little bit because I certainly didn't want that to be a part of this case, but if it's from him that it's brought out, then we leave it the way it was, and the Court at this time is of the opinion that a mistrial is not appropriate.

(Tr. Vol. IV, 615-16.)

{¶ 19} In his first assignment of error, defendant argues the trial court committed reversible error when it denied his motion for a mistrial. A mistrial should not be ordered in a criminal case merely because some error or irregularity has occurred. *State v. Reynolds,* 49 Ohio App.3d 27, 33 (2d Dist.1988). It is only necessary when the substantial rights of the accused or the prosecution are adversely affected, and a fair trial is no longer possible. *Id. See also State v. Franklin*, 62 Ohio St.3d 118, 127 (1991).

{¶ 20} Defendant asks us to review his assignment of error pursuant to the rule of law articulated in *State v. Souel,* 53 Ohio St.2d 123 (1978). The *Souel* case sets out the specific conditions under which the *results* of a polygraph examination are admissible in a criminal trial for purposes of corroboration or impeachment. Plaintiff-appellee, the State of Ohio, does not argue that it met the conditions of *Souel.* Rather, the state argues that *Souel* does not apply to the facts of this case. We agree.

{¶ 21} The *Souel* conditions apply in cases where both parties agree to the admissibility of polygraph results. There was no such agreement in this case. Moreover, there was no direct evidence in this case that defendant submitted to a polygraph and no direct evidence of the results of any "test." At most, the unexpected evidence of a "test" permits an inference that defendant may have taken a polygraph and that he may have failed. In our opinion, the *Souel* conditions are not relevant under such circumstances. *See State v. Spirko*, 59 Ohio St.3d 1 (1991) (in the absence of evidence of polygraph results, trial court was not required to follow *Souel* in admitting the testimony of a state's

witness that he had asked the defendant if he would be willing to submit to a polygraph). Accordingly, the trial court was not required to follow *Souel.*

{¶ 22} The state argues that this case falls within the realm of the invited error doctrine. Invited error prohibits a party from "tak[ing] advantage of an error which he himself invited or induced the trial court to make." *Lester v. Leuck*, 142 Ohio St. 91 (1943), paragraph one of the syllabus. *See also Fostoria v. Ohio Patrolmen's Benevolent Assn.,* 106 Ohio St.3d 194, 2005-Ohio-4558, ¶ 12-13; *State v. J.G.,* 10th Dist. No. 08AP-921, 2009-Ohio-2857, ¶ 16. A number of appellate courts have concluded that the doctrine of invited error prevents a defendant who elicits or provides inadmissible polygraph evidence at trial, from raising the erroneous admission of such evidence either as grounds for mistrial or reversal on appeal. *See, e.g.*, *State v. Hairston,* 9th Dist. No. 05CA008768, 2006-Ohio-4925, ¶ 50 (where state's eyewitness unexpectedly refers to his polygraph test during cross-examination, the invited error doctrine prevents defense counsel from making further inquiry about the polygraph and then moving for a mistrial); *State v. Handwork*, 11th Dist. No. 2002-P-0134, 2004-Ohio-6181 (pursuant to invited error doctrine, murder defendant could not claim on appeal any error with respect to detective's reference to polygraph, where defense counsel elicited the testimony on direct examination); *State v. Kniep,* 87 Ohio App.3d 681, 686 (9th Dist.1993) (when testimony regarding a defendant's refusal to take a polygraph is elicited by the defense, the invited error doctrine prohibits the defendant from asserting the error on appeal).

{¶ 23} In our opinion, Gloege's references to a "test" were so subtle and so unobtrusive as to be easily overlooked by the jury. In fact, defendant's primary trial counsel failed to pick up on the references until co-counsel brought them to his attention. We agree with the prosecutor's opinion that providing the jury with a limiting instruction at that point in time might have brought unnecessary attention to otherwise innocuous testimony. This is particularly so given the fact that Gloege did not mention either the type of test or the purported results of the test.

{¶ 24} Clearly, it was defendant himself who brought attention to the fact that he took a test of some kind. In fact, he used the word "test" on 11 occasions during his trial testimony. All such references were in response to questions from defendant's counsel.

Thus, the record shows that the inference that defendant had taken and failed a polygraph arose, if at all, from defendant's repeated references to a "test."

{¶ 25} Defendant contends that a proposed jury question is proof that the polygraph was on the minds of the jurors and that he was unfairly prejudiced by the state's introduction of this inadmissible evidence at trial. The jurors presented the trial court with the following proposed questions for defendant:

> When I go take the test.
>
> What is "the test"?
>
> Interview?
>
> [L]ie detector test?[2]

{¶ 26} As noted above, if the jury had become aware of the possibility that defendant had taken and failed a polygraph, such awareness was due primarily to defendant's own testimony. The fact that the jurors intended the trial court to ask the question of defendant, not Gloege, supports this conclusion. In short, the proffering of such a question by the jurors does not prove *unfair* prejudice.

{¶ 27} We note that there is no argument either that the prosecutor willfully failed to redact the references in the videotape or that defendant deliberately testified about "taking a test" in order to obtain a mistrial. Nevertheless, in applying the invited error doctrine, we find that any error arising from the unexpected admission of the polygraph evidence was invited by defendant's own testimony. Furthermore, we find the trial court's explanation of its ruling was reasonable under the circumstances and the trial court did not abuse its discretion when it denied defendant's motion for a mistrial. Therefore, defendant's first assignment of error is overruled.

{¶ 28} In his second assignment of error, defendant argues the trial court erred by failing to instruct the jury that defendant could be found NGRI. We disagree.

**B. Jury Instruction**

{¶ 29} Pursuant to R.C. 2901.01(A)(14), "[a] person is 'not guilty by reason of insanity' relative to a charge of an offense only if the person proves, in the manner

---

[2] The trial court did not ask the question of defendant.

specified in section 2901.05 of the Revised Code, that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts."[3]

{¶ 30} Defendant concedes that he did not ask the trial court to instruct the jury as to the affirmative defense of NGRI. As a general rule, a party forfeits all but plain error concerning jury instructions if the party fails to object before the jury retires. *See, e.g., State v. Jackson,* 92 Ohio St.3d 436, 444 (2001); *State v. Cihonski,* 178 Ohio App.3d 713, 2008-Ohio-5191 (3d Dist.). Citing *Cihonski,* defendant argues that, given the evidence in this case, the failure to give the NGRI instruction is structural error which justifies reversal even in the absence of a request.

{¶ 31} Just prior to the start of the jury trial, defense counsel admitted that he had no evidence to support defendant's NGRI plea, and he subsequently presented no expert testimony on the issue at trial. Although defendant contends that his own testimony establishes his entitlement to an NGRI instruction, our review of the record suggests otherwise.

{¶ 32} The substance of defendant's testimony and the manner in which he testified permit an inference that defendant has limited intelligence, although his I.Q. was not tested. His testimony also suggests that he has a limited ability to understand the proceedings and that his ability to aid his counsel in his own defense is questionable. As such, defendant's testimony at trial raises the question of his competency rather than his sanity. The competency issue was resolved as a result of a pretrial evidentiary hearing, and there is no argument in this appeal that the trial court erred in making its ruling.

{¶ 33} Defendant cites the following excerpt from closing argument in support of his assignment of error:

---

[3] R.C. 2901.05 provides in relevant part: "(A) * * * The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused. * * * (D) * * * (1) An 'affirmative defense' is either of the following: * * * (b) A defense involving an excuse or justification peculiarly within the knowledge of the accused, on which the accused can fairly be required to adduce supporting evidence."

[DEFENSE COUNSEL:]  Let's go over Mr. Jones' mental health issues, and then we'll deal with the witnesses. As far as his competency to stand trial, as far as his sanity, as far as his mental health, his statements on the stand speak more clearly than anything else ever could.

He barely understands what's happening to him, and he's not even answering the questions I'm asking in the way that will help him best.

* * *

 [DEFENSE COUNSEL:]  He hasn't been given a fair shake throughout this process. He hasn't been given a fair shake in his whole life. He's the dumb guy that the authority figures have always told, "Horatio, you are wrong. Horatio, sit down. Horatio, shut up. Horatio, do what you are told to do."

And you know what? That's what he did. He got into that interview room twice, not once, but twice, and with two different investigators, and he did what he was told to do, because that's how Horatio has managed to stay out of trouble all his life.

(Tr. Vol. IV, 566-67; 576-77.)

{¶ 34} While defense counsel speaks in terms of "mental health issues" and "sanity," his argument and the evidence in the record fails to permit a finding that defendant suffers from a severe mental disease of defect and that he cannot appreciate the wrongfulness of his conduct.

{¶ 35} Defendant argues that several of the jurors' written questions indicate that an NGRI instruction was necessary.  For example, jurors asked whether defendant had ever been "diagnosed," if there was any "clinical impression," or if defendant was taking "prescription medication."  In our view, such questions highlight the lack of relevant evidence on the issue of sanity rather than the need for an NGRI instruction.  Moreover, defendant's NGRI defense is clearly inconsistent with his testimony at trial that he was lying when he told investigators he performed cunnilingus on the victim.  Defendant's initial claim that the victim consented to the sexual contact is also inconsistent with an NGRI defense.  *See State v. Monford,* 190 Ohio App.3d 35, 2010-Ohio-4732, ¶ 74 (10th

Dist.) (trial court's failure to give an NGRI instruction was not structural error where the insanity defense was clearly inconsistent with defendant's misidentification theory).[4]

{¶ 36} Based upon the foregoing, we find no error in the omission of the NGRI instruction in this case. Accordingly, whether we apply the plain error standard or the structural error standard, defendant's second assignment of error is without merit and is overruled.

## V.  DISPOSITION

{¶ 37} Having overruled defendant's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and DORRIAN, JJ., concur.

––––––––––––––––––––

[4] Motion to certify denied by *State v. Monford*, 10th Dist. No. 09AP-274, 2010-Ohio-5624; appeal allowed in part, 127 Ohio St.3d 1531,  2011-Ohio-376; appeal dismissed as improvidently allowed, 131 Ohio St.3d 40, 2011-Ohio-6398.