[Cite as *State v. Craft*, 2025-Ohio-2045.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  V.

DAKOTA CRAFT,

    DEFENDANT-APPELLANT.

CASE NO. 3-23-44

OPINION AND
JUDGMENT ENTRY

Appeal from Crawford County Common Pleas Court
Criminal Division
Trial Court No. 23-CR-0244

Judgment Affirmed

Date of Decision: June 9, 2025

APPEARANCES:

    *William T. Cramer* for Appellant

    *Matthew E. Crall* for Appellee

**MILLER, J.**

{¶1} Defendant-appellant, Dakota Craft ("Craft"), appeals the November 2, 2023 judgment entry of sentencing of the Crawford County Common Pleas Court. For the reasons that follow, we affirm.

{¶2} On August 8, 2023, Craft was indicted on six counts: Count One of felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony; Count Two of improperly discharging a firearm at or into a habitation in violation of R.C. 2923.161(A)(1), a second-degree felony; Count Three of intimidation of an attorney, victim, or witness in a criminal case in violation of R.C. 2921.04(B)(2), a third-degree felony; Count Four of having weapons while under disability in violation of R.C. 2923.13(A)(2), a third-degree felony; and Counts Five and Six of tampering with evidence in violation of R.C. 2921.12(A)(1), third-degree felonies. Counts One, Two and Five each included a firearm specification. At his arraignment on August 10, 2023, Craft entered not-guilty pleas to the counts in the indictment.

{¶3} A jury trial was held on October 19-20 and 23-24, 2023. At trial, Bobbilee Perry ("Perry") testified that she lived at 410 South Union Street in Galion, Ohio on May 23, 2023 with her boyfriend, her eight children, and her boyfriend's parents. That morning, she awoke to gunshots. Although initially Perry did not

believe that her house had been shot, shortly thereafter, she recognized that her house had been targeted when she noted bullet holes in her wall and television.

{¶4} Investigators at the scene observed a bullet hole in the window and one in the siding of the house at 410 South Union Street. Several days later, they learned of a third bullet entry in the garage behind the house. Law enforcement also collected three shell casings from the scene. Detective Robert Bukey recovered a bullet from inside Perry's dresser and another bullet in the sheets of the bed that Perry and her boyfriend, Dusty Harris ("Harris") were sleeping in at the time of the shooting.

{¶5} Although Perry was initially unsure of who fired a gun into her house, she detailed that she soon began to suspect Craft. Perry recalled an incident two days earlier where she and Harris were working outside on the deck of their house. Perry's friend Karrie Murphy ("Karrie") and her husband Brandon Murphy ("Brandon"), who had one time stayed at 410 South Union, were also present that evening helping Perry and Harris work on their deck and socializing. While working outside, Perry noticed Craft and his girlfriend Victoria Loftis ("Loftis") walking down the alley by 410 South Union together and laughing. The sighting of Craft and Loftis was uncomfortable because Brandon and Loftis had previously been involved romantically while Brandon and Karrie were separated. As a result, there was a sustained period of "bad blood" and "anger" between Karrie and Loftis. (Oct. 19-20 & 23-24, 2023 Tr. at 263-264).

**{¶6}** Karrie became upset at Loftis and Craft's presence, and Karrie followed Loftis around the corner, taunting her. Eventually, Karrie initiated a physical altercation with Loftis, and Perry, Harris, and Brandon followed Karrie and became involved in the altercation. However, Craft attempted to break up the fight and Craft and Loftis walked away.

**{¶7}** At 12:03 a.m. on May 23, 2023, Karrie sent Craft a message on Facebook messenger stating "Tf [sic] you sending me a friend request for? Nah nvm just tell your dirty bitch I ain't done with her yet." (State's Ex. C). At 4:30 a.m., Craft responded to Karrie's message saying "Idk who you even are lmao." (*Id.*). Within an hour, the shooting at 410 South Union occurred. Karrie testified that she believed Craft had the mistaken belief that she and her family resided at 410 South Union Street.

**{¶8}** Loftis testified that on the morning of May 23, 2023, she and Craft were staying in the garage of Craft's mother's house at 543 McDonald in Galion and had been staying there for several weeks. She described the location at 543 McDonald as being only a few blocks away from 410 Union Street and recalled that because Craft did not have a working vehicle, their main method of transportation was walking. Craft was in the business of selling drugs and Craft was using drugs, including steroids, hallucinogenic mushrooms, and marijuana.

**{¶9}** Loftis recalled that on the morning of May 23, 2023, she awoke around 4:30 or 5:00 a.m. concerned that Craft was not in bed. She got up and attempted to

locate him. Eventually, she observed Craft getting on his bicycle and leaving. Loftis was unsure of where he was going. Approximately 10 to 15 minutes later, Craft returned "out of breath" and "sweating." (Oct. 19-20 & 23-24, 2023 Tr. at 308-309). Loftis testified that in the time that Craft was gone on his bike, she heard three gunshots coming from the direction of Perry and Harris's house. Accordingly, Loftis suspected that Craft shot at Perry and Harris's house. Loftis testified that Craft later admitted to her that he shot three rounds through the front door of the house.

{¶10} When Craft got off his bike, she noticed that Craft had "bulk" consistent with a firearm on his waistband. (*Id.* at 341). Then, Craft asked Loftis to go with him to "ditch the bike." (*Id.* at 310). After abandoning the bike at a nearby trailer park, Craft and Loftis returned home. Loftis testified that she had seen Craft with a gun before and described the firearm as a black handgun with a snakeskin design on the handle grips.

{¶11} Loftis recalled that, on the morning of the shooting, she was in the shower when the police arrived at 543 McDonald to ask questions. Loftis recalled that Craft came into the bathroom to tell her the cops were there and to warn her to "be cool" and "keep my fucking mouth shut." (*Id.* at 313). Loftis stated that she did not tell the police that morning that Craft shot up the house because she understood Craft's statement to be a threat and she did not want him to hurt her.

{¶12} According to Loftis, in the weeks leading up to the shooting in May, Craft was using steroids, THC, acid, and DMT. With respect to Craft's steroid use, Loftis testified that she observed that Craft's steroid use caused him to act "angry" and that it seems like he had "roid rage." (Oct. 19-20 & 23-24, 2023 Tr. at 323).

{¶13} On June 28, 2023, several weeks after the shooting, Loftis was arrested on unrelated charges. While she was incarcerated, Loftis continued to communicate with Craft, who was also incarcerated. In one of the communications, Loftis stated, "Just remember who kept quiet bro..." (State's Ex. F-1). Craft responded to the message by stating "I know and just remember who trie[d] to keep you out of jail and better your life [for real]." (State's Ex. Nos. F-2, F-3).

{¶14} Eventually, Loftis spoke to law enforcement about her observations the morning of the shooting. In exchange for her truthful testimony, the State offered her a deal dismissing pending charges in her unrelated case. (State's Ex. P).

{¶15} Several additional witnesses testified regarding Craft's use of steroids and other drugs. Notably, Matthew Fargo ("Fargo"), a longtime friend of Craft, testified that he and Craft communicated frequently on the Facebook Messenger platform regarding various subjects, including their anabolic steroid use.

{¶16} In a June 9, 2023 conversation, Craft told Fargo that the steroids "made me do some bad shit." (State's Ex. N). Craft then sent Fargo two Facebook messages which Craft subsequently deleted. (*Id.*). However, Fargo recalled that the deleted messages may have been links to articles regarding the shooting in

Galion. (Oct. 19-20 & 23-24, 2023 Tr. at 403). Fargo testified that Craft then told him in person that he "shot a house up in Galion." (*Id.* at 406).

{¶17} Detective Patrick testified that information obtained from search warrants of Craft's phone and Facebook accounts indicated that he viewed the Galion Police Department website approximately 48 times between May 26, 2023 and July 8, 2023. According to Detective Patrick, the records law enforcement obtained started on May 1, 2023, but Craft did not begin searching the Galion Police Department Facebook page until after the shooting.

{¶18} State's Exhibit K-3, a recording of a phone conversation between Craft and his mother was also played at trial. During that conversation, Craft instructed his mother to delete the information on his phone by performing a factory reset of the device.

{¶19} At the conclusion of the trial, the jury found Craft guilty on all counts. However, the jury found Craft not guilty of the firearm specification associated with Count Five.

{¶20} On November 1, 2023, Craft appeared for sentencing. The trial court sentenced Craft to a combination of consecutive and concurrent sentences for an aggregate term of 20 to 24 years in prison.

{¶21} Craft filed a notice of appeal on November 27, 2023. He raises four assignments of error for our review. For ease of discussion, we address his first and second assignments of error together.

**First Assignment of Error**

**The trial court committed plain error by permitting the prosecution to present evidence that appellant refused to take a polygraph.**

**Second Assignment of Error**

**The trial court violated the Due Process rights of appellant by permitting the prosecution to present evidence that appellant refused to unlock his phone for the police.**

{¶22} In his first two assignments of error, Craft argues that the trial court erred by allowing two pieces of evidence. In his first assignment of error, Craft argues that the trial court erred by permitting evidence suggesting that Craft refused to take a polygraph test. In his second assignment of error, Craft challenges the trial court's decision to permit testimony that Craft refused to provide law enforcement with the PIN to unlock his cell phone. For the reasons that follow, we disagree.

*Relevant Law*

{¶23} Generally, the admission or exclusion of evidence lies within the trial court's discretion, and a reviewing court should not reverse absent an abuse of that discretion and material prejudice. *State v. Conway*, 2006-Ohio-2815, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). An abuse of discretion implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶24} However, at trial, Craft did not object to the evidence which he now assigns error, nor did he request the trial court issue a limiting instruction with

respect to the evidence. Accordingly, we review the admission of the evidence for plain error. *State v. Davis*, 2017-Ohio-2916, ¶ 23 (3d Dist.). *See also State v. Banner*, 2010-Ohio-5592, ¶ 17 (8th Dist.). We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Landrum*, 53 Ohio St.3d 107, 111 (1990), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. For plain error to apply, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceedings, and the error must have affected a substantial right. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Under the plain error standard, the appellant must demonstrate that there is a reasonable probability that, but for the trial court's error, the outcome of the proceeding would have been otherwise. *State v. West*, 2022-Ohio-1556, ¶ 35-36. *See also State v. McAlpin*, 2022-Ohio-1567, ¶ 90 ("McAlpin could not establish plain error, because he cannot show a reasonable probability that but for standby counsel's actions, the jury would have acquitted him.").

*Polygraph Examination*

**{¶25}** We turn first to Craft's argument that the mention of a polygraph test was plain error. "[T]o find plain error in this case we must determine that the error in admitting the testimony regarding the polygraph test affected the outcome of the trial." *Banner* at ¶ 19.

{¶26} "The results of a polygraph examination may be admissible at trial only under limited conditions." *Id.* at ¶ 20. Furthermore, "the mere offer or refusal to undergo such test should also be excluded because unwarranted inferences are likely to be drawn as to the defendant's guilt or innocence." *State v. Bates*, 1982 WL 5268, *4 (8th Dist. Apr. 1, 1982).

{¶27} At trial, the State offered a video recording of Detective Patrick's jailhouse interrogation of Craft. The quality of the audio was very poor, rendering much of Craft's statements intelligible. As a result, Detective Patrick summarized Craft's portion of their conversation.

> [State]: There you offered to have [Craft] submit to a polygraph?
>
> [Det. Patrick]: Yes.
>
> [State]: What is his response to you?
>
> [Det. Patrick]: He is not hesitant, but he agrees to do it and then in my opinion quickly justifies the fact that he uses steroids, so his heart rate would be elevated almost making any excuse in case it came back and he failed.
>
> [State]: He says to you his hea[r]t rate would be elevated and he checks it three times a day?
>
> [Det. Patrick]: Yes.
>
> [State]: It is in the hundreds or something like that?
>
> [Det. Patrick]: Yes.
>
> [Another portion of State's Exhibit G-4 was played.]

[State]:          There he says he checks his heart rate because he doesn't want to die, is that what you heard?

[Det. Patrick]:   Yes.

[State]:          You ask him then why do you use steroids?

[Det. Patrick]:   Yes.

[State]:          And what is his reply?

[Det. Patrick]:   Because I just do.

[Another portion of State's Exhibit G-4 was played.]

[State]:          All right. Detective, is it fair to say you offer the polygraph, he talks about the steroid use, he asks about it being today and your reply is what?

[Det. Patrick]:   It is not going to be today.

[State]:          Once you reply it is not going to get him out of jail today, what does he do?

[Det. Patrick]:   He leans forward and then I think he makes the comment, all right, let's go.

[State]:          So he was willing to do that if it kept him out today?

[Det. Patrick]:   Yes.

(Oct. 19-20 & 23-24, 2023 Tr. at 481-482).

{¶28} Craft argues that the above testimony and the accompanying video referencing the polygraph test constituted plain error. However, here, there was no direct evidence that Craft submitted to a polygraph examination or the results of any

examination, if, in fact, one was given. *State v. Jones*, 2014-Ohio-674, ¶ 21 (10th Dist.). "At most, the unexpected evidence of a 'test' permits an inference that defendant may have taken a polygraph and that he may have failed." *Id.* Indeed, the jury could have favorably interpreted Craft's willingness to submit to a polygraph examination.

{¶29} After reviewing the references to the polygraph test in the context of the trial, we do not find the references to the offer for a polygraph test affected the outcome of the trial. First, Craft's steroid use and the resulting effects of the drugs was central to the State's theory that Craft was under the influence of high levels of steroids at the time of the shooting which caused him to experience increased aggression. Further, a reasonable inference from the testimony detailed above is that Craft did agree to a polygraph test, but that the State decided not to administer one. Specifically, Detective Patrick states that Craft is "not hesitant" to take a polygraph test and that he is willing to take a test that day.

{¶30} Furthermore, given the overwhelming evidence of Craft's guilt, including the Facebook messages sent to Karrie immediately prior to the shooting, Loftis's testimony regarding her observations of Craft the morning of the shooting and his subsequent statements to her, and Fargo's statements regarding Craft's admission, we do not find that the reference to the offer of a polygraph examination constituted plain error.

{¶31} Craft's first assignment of error is overruled.

*Phone PIN code*

**{¶32}** In his second assignment of error, Craft alleges that the trial court committed plain error by presenting evidence that Craft did not provide investigating officers with the PIN to unlock his cell phone.

**{¶33}** Craft contends that his right to due process was violated when the State presented evidence that he did not provide law enforcement with the PIN code allowing law enforcement to access his phone.  However, any alleged constitutional violation is subject to harmless error review.  *State v. Angus*, 2017-Ohio-1100, ¶ 29-30 (4th Dist.).

**{¶34}** Here, the State played a recording of Detective Patrick's jail house interview with Craft.  *See* State's Exhibit G-4.  However, due to the poor audio quality of the video, at trial, the State again asked Detective Patrick to summarize the statements in the short video clip.

> [State]: This whole back and forth about his pin code for the phone, because of [it being] hard to hear, can you summarize for the jury what [Craft] said in response to what you said?
>
> [Det. Patrick]: Can you play it back again?  It was kind of a little hard to be able to sum it up.
>
> [State's Exhibit G-4 played for jury]
>
> [State]: All right.  Before we get to the next topic to finish this audio up, what is going on back and forth with him and the phone?

> [Det. Patrick]: Basically I'm asking for the pin code because sometimes when you send it off in order to try to get into the phone sometimes it can break. We try to give everybody the opportunity to cooperate. He didn't want to do that and when I told him I didn't want him to be upset in case the phone came back broke[n], he said it was a $40 phone from Wal-Mart. He didn't care about it.

> [State]: He wouldn't give you his pin code, didn't care if you broke it?

> [Det. Patrick]: Yes.

> [State]: You have got to do your job?

> [Det. Patrick]: Yes.

(Oct. 19-20 & 23-24, 2023 Tr. at 482-483).

> Then, in closing arguments, the State made the following statement:

> Ultimately, when you are looking at not just the credibility of everything else, what does he do to get away with this crime? He refuses to give them his phone password, which in and of itself you are allowed to do that, right? But there is nothing in my phone, but I'm not going to let you look into it. . .

(Oct. 19-20 & 23-24, 2023 Tr. at 616).

**{¶35}** However, after reviewing the statements in concert with the overwhelming evidence of Craft's guilt, we do not find that the statements affected the outcome of the trial. To the extent that the statements suggest that Craft is cognizant of incriminating information on the phone, we find that the State presented additional, stronger evidence to that end. Notably, the State presented evidence that Craft instructed his mother to perform a factory reset of his phone in

-14-

an effort to erase incriminating information. Furthermore, the State presented evidence that Craft erased some messages from his phone and on the Facebook Messenger platform in an effort to conceal potentially incriminating information from investigators. Accordingly, an error, if any, was harmless beyond a reasonable doubt.

{¶36} Moreover, as detailed in the discussion of Craft's arguments relating to the reference to a potential polygraph examination, in light of the overwhelming evidence of Craft's guilt, we do not find that the statements regarding Craft's refusal to provide investigators with the passcode to his phone affected the outcome of the proceeding. Accordingly, we do not find that the inclusion of the evidence at issue constituted plain error.

{¶37} Craft's second assignment of error is overruled.

### Third Assignment of Error

**Cumulative error from the improper evidence that appellant refused to take a polygraph and refused to provide the police with access to his phone deprived appellant of a fair trial.**

{¶38} In his third assignment of error, Craft argues that he was deprived of a fair trial due to the cumulative effect of the alleged errors outlined in his first two assignments of error. We disagree.

{¶39} Under the cumulative-error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually

constitute cause for reversal." *State v. Spencer*, 2015-Ohio-52, ¶ 83 (3d Dist.). "To find cumulative error, a court must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors." *In re J.M.*, 2012-Ohio-1467, ¶ 36 (3d Dist.). Here, we have not found that the trial court committed any errors, let alone, multiple harmless errors. Therefore, the cumulative-error doctrine does not apply. *See State v. Jamison*, 2016-Ohio-5122, ¶ 40 (9th Dist.), abrogated on other grounds, *State v. Haynes*, 2022-Ohio-4473 ("If there [are] not multiple errors, . . . the cumulative error doctrine does not apply."); *State v. Carpenter*, 2019-Ohio-58, ¶ 104 (3d Dist.), citing *State v. Bertuzzi*, 2014-Ohio-5093, ¶ 110 (3d Dist.).

{¶40} Craft's third assignment of error is overruled.

### Fourth Assignment of Error

**The trial court erred by refusing to merge felonious assault and discharging a firearm at or into a habitation.**

{¶41} In his fourth assignment of error, Craft argues that the trial court erred by failing to merge his convictions for felonious assault and discharging a firearm at or into a habitation. He argues that by failing to merge the convictions, the trial court misconstrued the statute for discharging a firearm at or into a habitation.

*Allied-Offenses Review*

**{¶42}** We review de novo whether offenses are allied offenses of similar import. *State v. Tall*, 2023-Ohio-1853, ¶ 7 (3d Dist.). "De novo review is independent, without deference to the lower court's decision." *State v. Hudson*, 2013-Ohio-647, ¶ 27 (3d Dist.).

> R.C. 2941.25, Ohio's multiple-count statute, provides:
>
> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

The Supreme Court of Ohio has directed the use of a three-part test to determine whether a defendant can be convicted of multiple offenses:

> As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*State v. Ruff*, 2015-Ohio-995, ¶ 31.

**{¶43}** "[T]wo or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at ¶ 23. "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." *Id.* at ¶ 26. "[A] defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *Id.*

**{¶44}** The term "animus" means "purpose or, more properly, immediate motive." *State v. Logan*, 60 Ohio St.2d 126, 131 (1979), abrogation recognized in *Ruff*. "Like all mental states, animus is often difficult to prove directly, but must be inferred from the surrounding circumstances." *Id.* "Thus, the manner in which a defendant engages in a course of conduct may indicate distinct purposes." *State v. Whipple*, 2012-Ohio-2938, ¶ 38 (1st Dist.). "Courts should consider whether facts appear in the record that 'distinguish the circumstances or draw a line of distinction that enables a trier of fact to reasonably conclude separate and distinct crimes were committed.'" *Id.*, quoting *State v. Glenn*, 2012-Ohio-1530, ¶ 9 (8th Dist.).

*Analysis*

**{¶45}** In support of his assignment of error, Craft argues that the trial court erred by failing to merge his convictions for felonious assault and discharging a firearm. He argues that, in so doing, the trial court "misconstrues" the statue for

discharging a firearm into a habitation. He contends that because that statute is allegedly designed to protect against harm to people who "are likely to be in the structure, not to protect the structure itself" that "the import of discharging a firearm at or into a habitation is really no different than felonious assault." (Appellant's Brief at 22). We disagree.

**{¶46}** Contrary to Craft's assertion, "[i]t is well-settled that improperly discharging a firearm into a habitation and an associated assault charge are not allied offenses of similar import." *State v. Fisher*, 2024-Ohio-4484, ¶ 220 (8th Dist.). *See also State v. Grayson*, 2017-Ohio-7175, ¶ 24-25 (8th Dist.); *State v. Scott*, 2018-Ohio-3791, ¶ 35 (8th Dist.). "This is because the 'harm caused by improperly discharging a firearm into a habitation is to the "occupied structure" itself,' whereas the harm from a felonious assault is to an individual." *Id.*, quoting *Grayson* at ¶ 24-25.

**{¶47}** Irrespective of whether Craft's intent when firing into the house, and more specifically, the room where Perry and Harris were sleeping, was to injure the occupants, the violation of discharging a firearm into a habitation occurred when Craft fired the gun into the house. Further, although not required for a conviction for discharging a firearm into a habitation, the shots also endangered Perry, Harris, and the other occupants of the home. *State v. Lambert*, 2021-Ohio-17, ¶ 62 (2d Dist.).

{¶48} Even if the offenses of felonious assault and discharging a firearm into a habitation were committed with the same conduct and animus, they involved separate, identifiable victims, and the harm caused by the improper discharge was distinct from the harm experienced by the occupants of the home. *Id.* at ¶ 63. Accordingly, the trial court did not err by denying Craft's request to merge his convictions for improper discharge into a habitation and felonious assault. *See Grayson* at ¶ 25.

{¶49} Craft's fourth assignment of error is overruled.

*Conclusion*

{¶50} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Crawford County Court of Common Pleas.

*Judgment Affirmed*

**WALDICK, P.J. and ZIMMERMAN, J., concur.**

**/jlm**

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

Mark C. Miller, Judge

Juergen A. Waldick, Judge

William R. Zimmerman, Judge

DATED:
/jlm